UNITED STATES, Appellee

v

JAMES C. HOOD, Private First Class, U. S. Army, Appellant

9 USCMA 558, 26 CMR 338

---

No. 11,013

Decided September 12, 1958

*Major Frank C. Stetson, Captain John F. Christensen,* and *First Lieutenant Frank J. Lane, Jr.,* were on the brief for Appellant, Accused.

*Lieutenant Colonel John G. Lee, Major Thomas J. Nichols, First Lieutenant Jay D. Fischer,* and *First Lieutenant Jon R. Waltz* were on the brief for Appellee, United States.

## Memorandum Opinion of the Court

GEORGE W. LATIMER, Judge:

This accused pleaded guilty to the offense of assaulting a fellow-soldier by cutting him on the shoulder with a knife, in violation of Article 128(b)(1), Uniform Code of Military Justice, 10 USC § 928. He was sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for eighteen months. The convening authority approved only so much of the sentence adjudged as included dishonorable discharge, total forfeitures, and confinement at hard labor for one year, and the board of review affirmed. The accused petitioned this Court for review, raising three errors: That the evidence was insufficient as a matter of law to sustain the findings of guilty; that the rulings of the law officer were incorrect and his instructions were insufficient, erroneous in law, and materially prejudiced the substantial rights of the accused; and that he was denied legally qualified counsel at his Article 32 (Uniform Code of Military

Justice, 10 USC § 832) hearing, in contravention of United States v Tomaszewski, 8 USCMA 266, 24 CMR 76.

An accused's guilty plea ordinarily amounts to a waiver of such claims of error. United States v ▓▓▓▓▓▓ Lucas, 1 USCMA 19, 1 CMR 19; United States v Rehorn, 9 USCMA 487, 26 CMR 267. However, in an affidavit accompanying his petition, the accused sought to differentiate this case from ordinary appellate review on the record, by averring his innocence of the charged offense, alleging his plea was improvidently entered, and placing responsibility for his improvident judicial confession upon the law officer and his own trial defense counsel. Found among his averments is one that he was threatened with eleven years' confinement unless he pleaded guilty pursuant to a pretrial agreement with the convening authority that his sentence would not exceed dishonorable dis-

**559**

charge, total forfeitures, and confinement at hard labor for more than one year. These are the material allegations of his affidavit:

". . . [T]he agreement was concluded only fifteen minutes before trial inasmuch as I had refused the urging of my defense counsel prior to that time to accept the agreement and plead guilty. Fifteen minutes before the court convened, I was again approached by my defense counsel together with Major Petkoff who served as law officer in my case.

"That Major Petkoff explained to me the operation of a pre-trial agreement on a guilty plea and advised me to plead guilty in order to get the matter over with. Further, Major Petkoff coached me as to the reason I was to give for my plea of guilty when he was later to question me during a conference out of the hearing of the members of the court after I pleaded guilty in court.

"That I am not guilty of the offense charged and that my plea of guilty was made only at the urging of my defense counsel and the law officer who threatened me with eleven years confinement at hard labor if I did not plead guilty."

While the accused's petition was pending before this Court, the Government moved to strike the above-quoted portions of his affidavit. The theory behind the motion was that no assignment of error had been made in the petition for review and that the accused was attempting to impeach the record of trial, since the transcript reveals that he, in response to the law officer's question:

"Now, before I receive your plea of guilty, I would like an explanation from you as to why you are pleading guilty."

had replied: "Because I am guilty, sir."

In further support of its motion, the Government alluded to a stipulation of facts signed by the accused which had been introduced in evidence. Those recorded facts were sufficient to support a finding of guilty of the alleged offense. Finally, the Government contended the assertions made by the accused with regard to the circumstances surrounding his plea could only be presented in a petition for a new trial, in accordance with Article 73, Uniform Code of Military Justice, 10 USC § 873. Appellate defense counsel recognized that the accused was seeking to raise matters dehors the record and, in a prudent effort to protect their client, see United States v Roberts, 7 USCMA 322, 22 CMR 112, filed a timely petition for a new trial under Article 73, supra. In this petition, the accused relied again upon his original sworn statement to this Court, plus one allegation that he had been "induced" to plead guilty "upon a promise from my defense counsel that, unless I entered a guilty plea, I would be sentenced to confinement at hard labor for eleven years." Affidavits from accused's defense counsel and the law officer were then filed with this Court, categorically denying the material allegations of accused's affidavit. The substance of trial defense counsel's sworn statement, as pertinent, was that the accused originally faced charges of one assault with grievous bodily harm intentionally inflicted and two communications of threats to kill, in violation of Article 128(b)(2), supra, and Article 134, Uniform Code of Military Justice, 10 USC § 934, respectively; that the maximum imposable penalty for those offenses was dishonorable discharge, total forfeitures, and confinement at hard labor for eleven years; that he originally concluded the accused had a fair chance to defend on the merits; that subsequently among the persons he interviewed in his preparation of this case was an eyewitness of the assault who would readily and clearly testify to the use of a knife by the accused in slashing the victim; that the prosecution was planning to use his testimony; that, in his opinion, the accused's chances of prevailing on the aggravated assault charge with such damaging testimony available to the Government were dim except for the possibility of the court-martial reducing the assault charge to the lesser included offense of assault with a dan-

560

gerous weapon; that he believed the Government had sufficient evidence to convict the accused of communicating one of the alleged threats to kill; that, in order to perform his task in the best possible manner, be explored the possibility of negotiating a plea, as an alternative to contesting the case; that he discussed that possibility with the staff judge advocate and received assurance the convening authority would, if the accused elected to plead guilty, approve a sentence no greater than a dishonorable discharge, total forfeitures, and confinement at hard labor for one year. Defense counsel concluded his affidavit by asserting he consulted with the accused and informed him fully of the two alternatives facing him. The following quotation sets out the material parts of his affidavit:

"I . . . immediately conferred with James Hood. I advised him of the late discovery of the witness who would testify that he saw Martin slashed by him. I then reveiwed [sic] the evidence again, advancing my opinion about the case and indicating to him my belief that he would be convicted of at least the '3 year' assault and of one of the threats thus giving the Court the opportunity to sentence him to as many as six years. I then indicated to him that I thought the Court, after considering all circumstances, would be inclined to be harsh in their sentence. I qualified this observation with the fact that the Board of Review stands as a protection against excessive sentences.

"I then apprised him of the possibility of entering into the negotiated plea. I stated that if he were innocent of the knifing charge, he should contest the case; but if he were quilty [sic], he was well advised to enter into a negotated [sic] plea. After some thought and deliberation on his part, he stated that it probably would be best if he were to plead quilty. He then signed the typed offer to plead quilty which I had prepared and brought with me, and I notified the Staff Judge Advocate of his decision. In addition, I advised Hood that he could withdraw his offer any time prior to the trial of the following morning, and that I would again raise the question of his plea with him prior to the trial. The following morning I again questioned him about his plea, and he stated that he had not changed his mind and we proceded [sic] as reflected in the record of trial.

"A few minutes prior to the trial Major Petkoff, at my request, did explain the out-of-Court hearing procedure at which time Major Petkoff was to question him regarding his plea of quilty. Major Petkoff did not in any way threaten Hood or advise him in regard to his plea."

The law officer's affidavit, as pertinent, is as follows:

". . . Prior to trial, while I was working in the Courts and Boards Section of the 1st Battle Group, 87th Infantry, I was approached by the accused James C. Hood (whom I had never seen previously) and his trial defense counsel, First Lieutenant David D. Dowd. Lieutenant Dowd, in the accused James C. Hood's presence, requested that I advise James C. Hood as to what questions I would ask him in an out-of-court hearing in the event that James C. Hood pleaded guilty to the charges. I then advised James C. Hood in the presence of Lieutenant Dowd that should he plead guilty, I would query him concerning the following subjects in an out-of-court hearing which would thereafter be appended to the record of trial:

a. His understanding of the pretrial agreement;

b. That he could withdraw his plea of guilty at any time prior to sentence;

c. Whether he was satisfied with his defense counsel;

d. Why he was pleading guilty; and

e. The meaning and effect of his plea of guilty.

"At no time did I advise the accused James C. Hood with respect to

his plea in this case, nor did I advise him to plead guilty in order to get the matter over with.

"I did not coach James C. Hood in any manner.

"I did not urge James C. Hood to plead guilty.

"I did not at any time threaten James C. Hood with any period of confinement at hard labor in the event he did not plead guilty."

While we recognize the penchant of convicted felons for turning on their counsel, out of a superabundance of caution and because of the direct conflict in the facts set out in the sworn statements of the accused and his defense counsel and the law officer, we determined to hear testimony from each of the affiants.

The accused took the witness chair before the members of this Court. His testimony before us largely repudiated the material assertions in his affidavits. The charges of coaching, threatening and promising vanished into nothingness when he was on the witness stand. His testimony concerning the circumstances surrounding his pretrial agreement to plead guilty did not run counter in any material respect to the affidavit of his trial defense counsel, up to the point shortly before the trial commenced when they met and conversed with the law officer. Even then no dispute, with one exception, developed, for accused did not rebut defense counsel's testimony that he, in company with the accused, sought out the law officer because the latter would, under a recently initiated procedure, conduct a recorded out-of-court hearing following the accused's entry of a guilty plea. Defense counsel knew the basic purpose of this inquiry was to afford the law officer an opportunity to ascertain whether the accused understood the terms of his agreement with the convening authority or had entered the plea improvidently and that he was not finally committed to the plea at any time during his trial. But defense counsel did not know in what form these questions would be framed. To put the accused at ease and to avoid the possi-

bility that he might inadvertently jeopardize his own best interests during this phase of his trial, defense counsel, in the presence of the accused, merely asked the law officer to explain and familiarize the accused with the questions which would be asked him during this out-of-court conference. The law officer at the time expected a contested case and was in the process of preparing his instructions when the discussion took place. In accordance with defense counsel's request, he explained to the accused the questions which would be asked if the latter elected to plead guilty.

While we have stated generally that accused recanted the material allegations of his affidavit, we prefer to deal with this subject in more detail. He conceded he had read and knew the contents of the document, but his position before us was that he had not been coached or threatened in any way by the law officer or his own counsel at any time. He sought to place the blame for these averments on the shoulders of an assistant staff judge advocate at Fort Leavenworth, Kansas, who assisted him in the preparation of his charges. He also retracted his allegation that defense counsel had made any sort of promise to him, and he testified he had no complaint about his counsel or the law officer except that the latter talked to him before trial. As to other points raised in his affidavit, his testimony was vague and inconsistent, and the only remaining bit of evidence which would possibly support any charge of coercion is found in a new claim that the law officer told him "the General might be angry" if he did not plead guilty. Both defense counsel and the law officer vehemently denied this testimony and, in the light of this record, we accept their testimony as being true.

It is patent from the foregoing, plus other evidence developed at the hearing, that accused was fully informed on every subject by his counsel, and he does not point out one instance of dereliction of duty, misadvice, or failure to advise. He concedes his counsel explained the various alternatives avail-

able to him and the risk each entailed. He was given ample opportunity to consider which course he preferred to pursue, and his freedom of will was in no way impaired. In fact, we encounter no difficulty in concluding upon this record that defense counsel and the law officer acted entirely in the accused's best interest. By turning on them he did no more than momentarily cast a cloud on their professional competency, which we trust will disappear with the publication of this opinion.

From all of the foregoing, we find that accused's decision to plead guilty upon terms obtained by his counsel was a free exercise of his own will, with the full and fair understanding of his right to contest the case at any time before sentence. Every step taken was for his benefit, and every safeguard was afforded him. His belated effort to escape the penalty for his crime at the expense of those who sought to help him is grounded on the shoals of his own misrepresentations.

The petitions for a new trial and grant of review are both denied.

Chief Judge QUINN concurs.

FERGUSON, Judge (concurring in the result):

I concur only in the result. In two respects I cannot sanction the practice the Government followed in this case: (1) I do not approve of pretrial conferences between the accused and the law officer in the course of which the latter advises the accused concerning subjects to be covered in prospective out-of-court hearings; (2) nor can I condone the defense counsel negotiating a plea with a convening authority before consulting his client in this respect.