UNITED STATES, Appellee

v

FRANK D. WIMBERLEY, Private, U. S. Army,
Appellant

16 USCMA 3, 36 CMR 159

3

No. 18,562

February 4, 1966

Captain *Frank J. Martin, Jr.,* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Jacob Hagopian* and *Colonel Joseph L. Chalk.*

Captain *Michael E. Phenner* argued the cause for Appellee, United States. With him on the brief were *Colonel Edwin G. Schuck, Colonel Joseph J. Crimmins, Lieutenant Colonel Francis M. Cooper,* and *Captain Charles M. Pallesen, Jr.*

## Opinion of the Court

QUINN, Chief Judge:

A general court-martial convened at Stuttgart-Vaihingen, Germany, convicted the accused of premeditated murder and sentenced him to death. The board of review affirmed the findings of guilty, but reduced the sentence to life imprisonment, dishonorable discharge, and forfeiture of all pay and allowances. The accused has brought the case to this Court on fifteen assignments of error.

Four of the claims of error deal with the accused's mental condition. In different forms, two of these allege that the accused was prejudiced by his counsel's failure to raise, at trial, issues as to his competency to understand the proceedings against him and his ability to adhere to the right, at the time of the commission of the offense. See Brubaker v Dickson, 310 F2d 30 (CA9th Cir) (1962). The record,

however, indicates that, before trial, defense counsel requested a psychiatric evaluation of the accused. In response thereto, a board of medical officers at the 2d General Hospital, Landstuhl, Germany, examined the accused from January 30 through February 11, 1963. Also, previous to the offense, the accused had been examined on separate occasions by other psychiatrists. The purpose of these examinations was to determine whether he should be administratively discharged. The reports of these psychiatrists were known to defense counsel. In one, the doctor certified there was "no evidence of any mental disorder, of psychotic proportions," and the accused was "mentally responsible, able to distinguish right from wrong and to adhere to the right, and has the mental capacity to understand and participate in board proceedings."

6

The second report also certified that the psychiatrist found "[n]o evidence of any mental illness." The medical board at the hospital considered "a great deal of information" submitted by defense counsel, which included letters from members of the accused's family and reports from two hospitals in Detroit, Michigan, in which, before his entry into the service, the accused had received treatment for an uncategorized ailment. At the first hospital, where the accused received emergency treatment, it was suspected he had had an epileptic seizure. This diagnosis was ruled out at the second hospital. There, it was concluded that while the accused required some "'psychiatric evaluation,'" no "'emergency'" was present; it was recommended that he attend the outpatient clinic. The accused apparently never reported to the clinic.

Various psychological and neurological tests were administered to the accused during his stay at the 2d General Hospital. The results of these tests and the reports of the previous psychiatric examinations were also considered by the board of medical officers. No evidence of "neurological or psychiatric disease" to impair the accused's "appreciation of reality" was found by the board. Neither did it find any evidence to indicate the accused was "unaware of his actions" at the time of the offense. It concluded the offense was not the result of any mental illness, disease or defect, and that the accused was at all times able to adhere to the right, and to act cooperatively and intelligently in his own behalf.

Competent lay testimony, as well as expert opinion, may be sufficient to raise an issue as to the accused's mental condi- tion. All the expert opinion was adverse to the accused. The mass of other information, apparently assembled by defense counsel, contained only vague allusions to a possible problem; and these the experts had examined and disregarded. The allusions were too insubstantial by themselves to merit serious consideration. Faced with these facts, was it wrong for defense counsel to conclude he had no legitimate sanity issue? We think not. In our opinion, defense counsel was not bound to continue his search on the possibility that he might ferret out a psychiatrist or psychologist willing to testify to a contrary opinion, or a lay person who knew the accused but believed him to be of unsound mind. The fact that expert opinion to that effect was eventually obtained after the trial does not necessarily brand counsel's efforts or judgment before trial as incompetent or inadequate. On the record before us, we are satisfied that, in this aspect of the case, defense counsel's efforts were adequate and his professional judgment was sound.

After the trial, appellate defense counsel obtained additional information as to the accused's sanity. Two psychiatrists and a clinical psychologist reviewed the previous material and some supplemental data, and concluded that the accused was mentally incompetent. Their reports were submitted to the board of review. Also before the board of review were a post-trial psychiatric evaluation of the accused by a board of medical officers at the United States Disciplinary Barracks, Fort Leavenworth, Kansas, and a report by the Chief of the Psychiatry and Neurology Division, Office of the Surgeon General, Department of the Army. These reports confirmed the pretrial evaluations of the accused's mental capabilities. With the consent of the accused, the board of review directed another examination. A medical board examined the accused and reviewed all the previous medical opinion in the case. The findings and opinions of this board coincided with those of the pretrial psychiatric evaluations.

Reviewing all the material evidence on the matter, the board of review indicated it was "satisfied beyond a reasonable doubt that there is no issue of mental responsibility or competence." Appellate defense counsel contend that, since the opinions of their experts were before the board

of review, it was legally bound to direct a rehearing of the case before a court-martial. The contention misconceives the power of an appellate tribunal as to an issue raised for the first time before it. The appellate court may consider the weight and the effect of the new matter to determine whether to direct a rehearing before a court-martial or to take other corrective action. See United States v Hood, 9 USCMA 558, 26 CMR 338; United States v Ferguson, 5 USCMA 68, 17 CMR 68. Here, the board of review made a comprehensive examination of the evidence, which included the opinions of fourteen doctors and one psychologist. It pointed out that divergence of opinion among psychiatrists is "not novel"; consequently, the mere presence of a difference of opinion did not prevent it from being "satisfied beyond a reasonable doubt" that the accused possessed the mental capacity to commit the offense and the mental competency to stand trial. Appellate defense counsel did not ask the board of review to take personal testimony from the experts, and they did not object to the procedure under which the board of review accepted the various reports as the basis upon which it could decide the sanity issues raised by the accused. See United States v Roland, 9 USCMA 401, 26 CMR 181; United States v Thomas, 13 USCMA 163, 32 CMR 163. We find no merit, therefore, in the attack on the board of review's disposition of the sanity issues.

Three assignments of error challenge the admission in evidence of a pair of trousers, stained with several small spots of blood, which was obtained in a search of the accused's locker. The board of review held that an objection by defense counsel did not go to the question of the legality of the search and seizure. Therefore, it did not consider the merits of the issues raised by the assignments. See United States v Gebhart, 10 US CMA 606, 28 CMR 172; United States v Sessions, 10 USCMA 383, 27 CMR 457. Defense counsel's objection could have been more precise. As we read the record, however, it was apparently understood to encompass an attack on the legality of the search. This is clear from the remarks of the law officer when he finally overruled the objection. He said: "The agent went to the commanding officer and obtained permission from the commanding officer to conduct the search. The objection is overruled."

Our interpretation of the defense position at trial does not aid the accused. A chemist at the United States Army Criminal Laboratory, Frankfort, Germany, testified he examined the blood spots on the trousers. Although he determined the blood was of human origin, he was unable "to type" it. His testimony in no way connected the blood spots with the offense. All the evidence as to the trousers contributed nothing significant to the case against the accused. The other evidence against the accused included a pretrial statement in which he admitted he inflicted the stab wounds on the victim and the discovery of his dog tags in the victim's apartment. From any point of view, even assuming the trousers should have been excluded, their admission in evidence did not prejudice the accused. United States v Smith, 13 USCMA 553, 33 CMR 85; United States v Simpson, 15 USCMA 18, 34 CMR 464.

On various grounds set out in five assignments of error, the accused contends that two pretrial statements in which he confessed to killing the victim were erroneously admitted in evidence. The factual background relating to these contentions can be briefly summarized.

The dead body of Maria Margarete Seipelt, forty-one-year-old proprietress of the Gasthaus Sonne in Ossweil, Germany, was found in the street several yards from the entrance to the Gasthaus, at about 2:00 a.m., November 17, 1962. She was clad only in a nightgown and shoes. The body bore multiple stab wounds in the back, chest, and head. A trail of blood spots led from the body to an apartment above the Gasthaus, which was occupied by

the victim. Investigation by civilian police and the Criminal Investigations Detachment led to the accused. At about 5:00 p.m., November 17, 1962, he was taken into custody, and interrogated by two Criminal Investigations Detachment agents. He gave them a written statement in which he admitted he killed Mrs. Seipelt.

At trial, the prosecution offered the November 17th statement in evidence, but on defense counsel's objection, the law officer ruled it inadmissible because the accused had not properly been advised of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831. A second sworn statement was made by the accused to a third investigator, on the afternoon of November 21st. Defense counsel objected to the admissibility of this statement on the ground it was the product of the inadmissible statement of November 17th. The accused testified in open court in support of the objection. He admitted that previous to making the statement he had been informed of his rights under Article 31; that at the time he had understood his rights under the Article; that he knew he did not have to make any further statement, but nevertheless he made one of his "own free will." However, he maintained he made the second statement because "according to the first statement that was taken,—then necessarily,—give me any reason not to give a second statement." The law officer overruled the objection and admitted the second statement.

Improper procurement by the Government of a particular item of evidence does not immunize the accused from the use by the Government of similar items of evidence which were thereafter legally obtained. The connection between the two items may be so attenuated that the taint of the first does not affect the second. Wong Sun v United States, 371 US 471, 9 L ed 2d 441, 83 S Ct 407 (1963); United States v Ellwein, 6 USCMA 25, 29, 19 CMR 151. An incriminating pretrial statement is not necessarily rendered inadmissible because on an earlier occasion a similar statement was obtained from the accused in violation of his privilege against self-incrimination. United States v Bayer, 331 US 532, 540, 91 L ed 1654, 67 S Ct 1394 (1947). The test for the admissibility of any pretrial statement is whether the accused was properly advised of his rights under Article 31, and that he made the statement voluntarily. United States v Monge, 1 USCMA 95, 2 CMR 1.

Where there are successive statements, it is not a precondition to the admission of a properly obtained statement, that the accused be informed that a previous statement cannot be used against him. Monge, supra, page 100. But the fact that an inadmissible statement was previously obtained is a factor to be considered in determining the voluntariness of the later statement. United States v Powell, 13 USCMA 364, 32 CMR 364; United States v Bennett, 7 USCMA 97, 21 CMR 223. Whether the taint of the first statement influenced the making of the second depends on the surrounding circumstances. United States v Caliendo, 13 USCMA 405, 32 CMR 405. If the time interval between the two statements is short, and there has been little or no change in the surrounding circumstances, it may be inferred that the impropriety which tainted the first statement still persists at the time of the making of the second. Bennett, supra. Here, four days elapsed between the two statements; the second was made to a different agent; the accused was thoroughly and correctly advised as to his rights under Article 31; and he admitted he made the second statement of his "own free will." On this showing, the law officer could reasonably conclude the second statement was made voluntarily, and after full compliance with the requirements of Article 31. See United States v Hogan, 9 USCMA 365, 26 CMR 145; United States v Green, 7 USCMA 539, 23 CMR 3. We, therefore, find no merit in the accused's contention that the November 21st statement was inadmissible as a matter of law.

We also find no merit in the conten-

**9**

tion that the instructions to the court-martial, as to its right to determine the voluntariness of the November 21st statement, were erroneous. The court-martial had heard the accused's testimony on the issue. It had been advised by the law officer that the first statement had been excluded from evidence because the accused had been "misadvised of his rights." It was further instructed that it must be "convinced beyond a reasonable doubt, from the evidence, that the presumptive influence of the earlier statement was severed before" it could conclude the second statement was voluntary. We are satisfied the court-martial was adequately and accurately instructed to consider the effect of the improper warning that required the exclusion of the November 17th statement on the voluntariness of the November 21st statement.

Between the accused's trial and his petition to this Court, the Supreme Court of the United States decided Escobedo v Illinois, 378 US 478, 12 L ed 2d 977, 84 S Ct 1758 (1964). The Court there held that an incriminating pretrial statement made by the defendant in an interrogation by police officers was inadmissible because the defendant had been denied the right to consult counsel. The principle of *Escobedo* is not new in military law. It had been considered and followed in a number of cases in this Court before the *Escobedo* decision. United States v Cadman, 10 USCMA 222, 27 CMR 296; United States v Wheaton, 9 USCMA 257, 26 CMR 37; United States v Gunnels, 8 USCMA 130, 23 CMR 354. However, a number of State and Federal courts have interpreted the Supreme Court's opinion in *Escobedo* as giving the accused the right to have counsel by his side during the interrogation, if "the focus" of the police investigation is on him. United States v State of New Jersey, 351 F2d 429, 436 (CA 3d Cir) (1965). Other courts have held that a confession made in the course of a police interrogation of a particular suspect is admissible despite the absence of counsel, if the suspect has not asked to consult with counsel.

Jackson v United States, 337 F2d 136 (CA DC Cir) (1964); United States v Childress, 347 F2d 448 (CA 7th Cir) (1965). We have held that an accused is not denied the assistance of counsel, unless he requests and is refused the right to consult counsel during the interrogation, or is misinformed as to his right to counsel. United States v Petty, 13 USCMA 398, 32 CMR 398. See also United States v Moore, 4 USCMA 482, 16 CMR 56.

This Court has always been alert to the accused's need for counsel at all stages of the proceedings against him. We are not persuaded, however, that the right to counsel must be extended to include the investigative processes. Under Article 31 of the Uniform Code of Military Justice, the accused must be informed he has the right to say absolutely nothing; but if he speaks, whatever he says may be used against him in a trial by court-martial. And, it must appear that the accused understands his right to remain silent. If the accused exercises his right to say nothing, but the agent persists in continuing the interrogation, such continued questioning may constitute coercion, and invalidate any statement obtained in the interrogative session. Nothing in the Uniform Code, supra, or in the decisions of this Court, and nothing in our experience with military methods of interrogation, indicate that the only feasible way to give maximum effect to the Constitutional right to the assistance of counsel is that the accused have counsel beside him during police questioning. Cf. United States v Moore, 14 USCMA 635, 641, 34 CMR 415. We adhere, therefore, to our previous decision, and hold that an incriminating statement given by the accused in a police interrogation, which meets the requirements of Article 31, is admissible in evidence, even though the accused is not informed he has the right to consult counsel during the questioning.

A third aspect of the group of alleged errors, in the admission of the pretrial statements, deals with the testimony of Dr. Thomas B. Hauschild. Dr. Hauschild was Chief of the Psychiatric and

Neurological Services at the 2d General Hospital. Apparently, he was the psychiatrist in charge of the evaluation of the accused, which had been requested by defense counsel. It will be recalled that his findings and conclusions established the accused's competency to stand trial and his mental capability to commit the offense charged. Dr. Hauschild was called initially as a Government witness. Defense counsel objected to questions by trial counsel about statements made by the accused to the doctor, in the course of the examination. The objection was based on the contention that Dr. Hauschild gave the accused insufficient advice as to his rights under Article 31, in that he did not inform the accused that the statements he made could be used as evidence against him in a trial by court-martial.

In United States v Higgins, 6 USCMA 308, 314, 20 CMR 24, we held that the advice to the accused as to his rights under Article 31 is sufficient "if it clearly conveys the purport of that Article." Dr. Hauschild admitted he did not read the Article "directly" to the accused. However, he explained to the accused that he was charged with the murder of a German woman; that whatever he told the doctor "was not a privileged communication"; that he did not have to say "anything whatsoever if he chose not to"; but what he did say would be part of the report on sanity which the doctor had to "render to the court." The inescapable import of Dr. Hauschild's advice is that, if the accused elected to speak, what he said could be used against him in a court-martial. The law officer, therefore, correctly overruled defense counsel's objection.

Before the board of review, and in this Court, the accused enlarged the scope of his objection to Dr. Hauschild's testimony. He now contends that when "a psychiatrist examines an accused solely for the purpose of testifying on the issue of mental competency or responsibility, he should not be permitted to relate to the court any statements made by the accused which pertain largely to the question of guilt or innocence." He places heavy reliance upon 18 USC § 4244, which establishes a proceeding for the Federal district courts in which to determine, before trial, the accused's mental competency to stand trial. In part, the statute provides: "No statement made by the accused in the course of any examination . . . , whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding." In United States v Shaw, 9 USCMA 267, 269, 26 CMR 47, we pointed out that the military rule promulgated in paragraph 151c(2) of the Manual for Courts-Martial, United States, 1951, is that "no privilege attaches" to communications between military personnel and military doctors. It was unnecessary in that case to consider the effect of the inconsistency between the Manual provision and the privilege established by Congress in 18 USC § 4244.

Many valid reasons are apparent to support the Manual rule. For example, medical examination or treatment in the military is often required for official purposes unrelated to prosecution for a violation of the Uniform Code of Military Justice. Cf. United States v Wilson, 4 USCMA 3, 5, 15 CMR 3; Taylor v United States, 222 F2d 398 (CA DC Cir) (1955), dissenting opinion of Circuit Judge Prettyman. Countervailing arguments for a limitation such as that provided by Congress in 18 USC § 4244 to protect an accused in a criminal situation also suggest themselves. But see Ashton v United States, 324 F2d 399 (CA DC Cir) (1963). However, Congress has left the promulgation of appropriate rules of evidence for courts-martial to the President. Article 36, Code, supra, 10 USC § 836. If a rule of evidence prescribed by the President is not contrary to Constitutional due process or to the provisions of the Uniform Code of Military Justice, this Court cannot invalidate the President's directive because its disadvantages outweigh its merits, or because a different procedure is followed in the Federal criminal courts. United

States v Smith, 13 USCMA 105, 32 CMR 105.

Military criminal practice "parallels, but does not duplicate, that in the civilian community." United States v Kirsch, 15 USCMA 84, 93, 35 CMR 56. The language of 18 USC § 4244 clearly indicates that the preliminary proceeding to determine mental competency is intended to apply only to the regular Federal criminal courts. See United States v Kirsch, supra, page 96; United States v Baker, 14 USCMA 311, 34 CMR 91. The President has prescribed a similar procedure for the military. Manual for Courts-Martial, supra, paragraph 121. But he has also provided that statements made by the accused, in the course of a medical examination ordered in connection with the proceeding, are not privileged. *Id.*, paragraph 151c(2). The privilege established by section 4244 is not applicable to the military criminal practice. The accused was fully informed that no privilege attached to any statement he might make, and that every statement he made could be used against him. This aspect of the defense objection to Dr. Hauschild's testimony is also untenable.

A Criminal Investigations Detachment agent was the Government's last witness. After he had given his name and organization, the law officer interrupted the examination to caution trial counsel to "hide" something he had in his hand. He also indicated that if the object had been obtained as a result of the November 17th statement, which he had ruled to be inadmissible, it, too, would be excluded. At trial counsel's request, an out-of-court hearing was held. The record of this hearing shows that the object in trial counsel's hand was a knife covered by a black sheath. Trial counsel offered to prove that the knife had been obtained in a search of the roof of the building in which the accused lived. However, when the witness indicated the search had been made on November 17th, as the result of information received from the accused, trial counsel withdrew his proffer of the knife. At that point, defense counsel moved for a

12

mistrial. He noted that, several times during the trial, the law officer had had to caution trial counsel for holding objects in his hand in a way which made them visible to the court members before the objects were offered into evidence. The motion was denied. The accused contends he was prejudiced by this ruling.

On his own initiative, the law officer had cautioned trial counsel three times about his handling of the exhibits. The first occasion occurred about midway in the trial. Five photographs, showing various views of the stab wounds on the victim's body, had been marked Prosecution Exhibits 20 through 25 for Identification. Just before they were offered in evidence, the law officer instructed trial counsel to keep them turned in the direction opposite to the court members. Eventually, four of the exhibits were admitted into evidence; the fifth, Prosecution Exhibit 24 for Identification, was excluded, on defense counsel's objection that it was cumulative. Assuming the court members were improperly permitted to see the photographs before they were admitted in evidence, there certainly is no basis for the claim of prejudice as to the four photographs which were finally submitted to the court members. By defense counsel's own assessment, the fifth photograph was merely cumulative. As such, it can hardly be regarded as prejudicial. See Simmons v United States, 308 F2d 324 (CA DC Cir) (1962).

A pair of shoes and the knife contained in the sheath were eventually ruled inadmissible by the law officer. From certain remarks by the law officer it may fairly be inferred that the shoes were visible to the court members; it is, however, questionable whether the knife was seen by them. For present purposes, we may assume both were observed. The assumption does not import error in the law officer's ruling. At the time of the motion for a mistrial, the evidence against the accused included two pretrial confessions and the fact that the accused's identification tags were found in the victim's

apartment. It is, therefore, inconceivable that either, or both, of the excluded items had any effect upon the court members in their determination of the findings. In any event, since the items were essentially cumulative, the law officer could reasonably have concluded that an instruction to disregard all matters not properly admitted in evidence (an instruction he later gave) would be sufficient to protect the accused. There was, therefore, ample reason to conclude that trial counsel's lack of care in handling exhibits marked only for identification was not so prejudicial as to constitute imperious necessity for a mistrial. The law officer's ruling denying the motion was not erroneous. United States v Waldron, 15 USCMA 628, 36 CMR 126.

In addition to the photographs mentioned above, the law officer admitted three other photographs, reflecting different views of the body of the victim at the place of its discovery in the street. At trial, defense counsel contended that certain of the photographs were unduly inflammatory; appellate defense counsel have extended the objection to all. One of the photographs could have been ruled out as cumulative and unnecessary to a full understanding of the location and nature of the bruises it was intended to show. However, the law officer has wide discretion in the admission of evidence of this kind, and we find no abuse of his discretion in the admission of even this exhibit. United States v Hurt, 9 USCMA 735, 779, 27 CMR 3; United States v Thomas, 6 USCMA 92, 19 CMR 218.

In the last assignment of error, appellate defense counsel contend the accused was denied due process of law because, at trial, defense counsel failed to present any evidence in mitigation and offered no argument against the death sentence. For three days, defense counsel represented the accused with competence and vigor. Time and again, he presented multiple objections to exhibits and testimony damaging to the accused. As the board of review observed, he waged "a hard fought, hotly contested" case up to the findings. But, except for some incidental comments, defense counsel was unaccountably silent during the sentence proceedings. He offered no evidence in mitigation; and he presented no argument as to the sentence, even though trial counsel demanded the death penalty.

In this unusual and ambiguous situation, the law officer should have had an out-of-court conference to determine, if possible, the reasons for defense counsel's silence at this critical time. The board of review considered several possible explanations, some militating against the accused. However, it resolved all doubts in the accused's favor. That decision was correct. It observed that by law the court-martial could adjudge only death or life imprisonment for premeditated murder. Article 118, Uniform Code of Military Justice, 10 USC § 918. It then reviewed "all of the circumstances of the case" and concluded that only the lesser punishment should be affirmed. This action removed all risk of prejudice resulting from the alleged deficiency in defense counsel's representation of the accused in the sentence proceedings. United States v Weaver, 13 USCMA 147, 32 CMR 147. Accordingly, the decision of the board of review is affirmed.

Judges FERGUSON and KILDAY concur.