UNITED STATES, Appellee

v

WALTER J. WHITLEY, Commander, U. S. Navy, Appellant

18 USCMA 20, 39 CMR 20

No. 20,857

November 22, 1968

*Matthew J. Faerber, Esquire,* argued the cause for Appellant, Accused. With him on the brief were *Major L. G. Bohlen,* USMC, and *Lieutenant Scott M. Feldman,* JAGC, USNR.

*Commander Walter F. Brown,* JAGC, USN, argued the cause for Appellee, United States. With him on the brief was *Colonel C. R. Larouche,* USMC.

## Opinion of the Court

QUINN, Chief Judge:

A general court-martial convicted the accused of two specifications alleging lewd and lascivious conduct with an enlisted man and of one specification alleging the making of a false official statement to a Navy doctor, all in violation of Article 133, Uniform Code of Military Justice, 10 USC § 933. It sentenced him to be dismissed from the service. On review, a board of review affirmed the conviction and denied a petition for new trial. We granted further review to consider a number of assignments of error.

The record discloses a dismal picture of deceitful and capricious actions by high ranking Navy officers which were apparently designed to get the accused, then the aide to the President of the United States Naval War College, to discuss the alleged offenses in the absence of counsel, and which included his confinement in the locked, psychiatric ward of a Navy hospital, under orders forbidding his counsel to visit him. We need not, however, determine whether these actions affected the accused's consent to search an off-base building owned by him, which

20

was obtained while he was in the hospital, ostensibly undergoing psychiatric evaluation as a "suicidal risk." Neither need we consider the other assigned errors, except one. In our opinion, the petition for new trial should have been granted.

Seaman Dennis D. Hilty and Seaman Apprentice Andrew D. Poe testified to separate occasions when the accused allegedly picked them up, drove them in his car to a house he was in the process of renovating, and there made indecent proposals and engaged in certain acts with intent to satisfy his sexual desires. Hilty also testified that he struck the accused on the head with a billy club, which he admittedly had stolen from a police car, and which he intended to use to "roll queers." The day after the alleged Hilty incident, the accused was treated by a Navy doctor for a scalp laceration and pain in the chest; he told the doctor these injuries were incurred in a fall, but the Government's theory was that they resulted from the beating administered by Hilty, and the accused, therefore, lied in his answer to the doctor's question as to "how this had happened."

Material contradictions and conflicts appear in the testimony.[1] Most significant to this appeal is testimony by Hilty and Poe that they did not know each other. Hilty testified he did not meet Poe until "just . . . a few days ago when the trial started"; and Poe testified he "never knowed . . . [Hilty] 'till we came up here" for the court-martial. The board of review acknowledged the importance of the testimony, with the observation that it "was a material issue for the court in view of the number of questions on this subject posed by the court members." The accused's petition for new trial charged that this testimony was false. "[S]ubstantial evidence" of falsity appeared in the affidavits accompanying the petition and led the board of review to order that "further investigation be initiated and that the results thereof be reported" to it.

Over defense objection, responsibility for the investigation was turned over to the Naval Investigative Service. Apparently, no notice was given to the defense as to the time and place of questioning of witnesses, but, on several occasions, trial counsel appeared and participated in the proceedings. After examination of the report of investigation, the board of review decided it was "unable to con-

---

[1] Hilty, for example, testified that the accused told him there was a tenant in the building and Hilty should avoid a "squeaky board" in the room so as not to awaken the tenant. He also maintained that he hit the accused on the head with the billy club as the accused started to open the door of the room they were in; when struck, the accused "started to scream and holler" and Hilty "figured if he [the accused] had a tenant in the house, he would wake the tenant up so I left the house." However, when Hilty was later asked why he struck the accused when he was merely opening the door, he answered: "Because, when he [the accused] left to go down to get the can opener [for some beer], I didn't know whether he went to see his tenant or not." "As far as I know his tenant would be outside the door." Still later, when recalled as a witness and asked why he struck the accused after the accused had indicated they could part as friends, he answered: "I don't know." Poe testified that when he was in the accused's house he sat on a couch on the "first deck." But he admitted that the first floor of the building was "having some work done." The house was one of thirty being privately rehabilitated in a project described as "Operation Clapboard." Several witnesses, who were in the house during the period Poe purportedly was there, testified that the ground floor of the building contained just a few chairs, an old desk, and some dining-room furniture. At least two witnesses who "toured" the house testified they noticed "no sofa." Poe further testified he remembered the house and was able to identify it because there was "'a board missing from the garage door.'" Two defense witnesses, who were familiar with the premises, testified that the panel in the garage door was not broken until sometime after Poe had allegedly been there.

clude that there is a probability that Poe and Hilty testified falsely when they said that they had not known each other" prior to the court-martial.

We put aside threshold questions as to the propriety of the procedure used in the investigation, especially the allowance of participation by trial counsel, but disregard of defense counsel's request that the investigation be "conducted along the lines of an Article 32 Investigation." See United States v Hood, 9 USCMA 558, 562, 26 CMR 338; United States v DuBay, 17 USCMA 147, 37 CMR 411. Cf. United States v Turner, 7 USCMA 38, 21 CMR 164. Limiting ourselves to the alleged falsity of Hilty and Poe's testimony, in our opinion, the evidence demonstrates more than a probability that they lied about their previous association.

Before the first offense was allegedly committed, Hilty and Poe were messcooks at the United States Naval Station, Newport, Rhode Island. They were assigned to Galley 1803 for work, and both lived on the same floor in Barracks 348. About one hundred men were assigned to similar duty during the same period; these were divided into two crews of about forty to sixty men, and further divided into groups for particular activities, such as the serving line and the scullery crew. These circumstances made it appear "reasonable" to the board of review that Hilty and Poe "were not acquainted during their stay in Newport." In reaching its conclusion, the board of review acknowledged, but disregarded, certain testimony by Machinist's Mate First Class Donald R. Mikesell.

During the crucial period, Mikesell was a master-at-arms and leading petty officer at Galley 1803 and chief master-at-arms at Barracks 348. He testified that Poe and Hilty lived on the same floor of the barracks and to the best of his knowledge they "occupied the same berthing cubicle." He also testified that when Hilty went absent without leave (just after the first offense was allegedly committed), he was delegated to inventory Hilty's ef-

fects, and he found articles of clothing belonging to Poe in Hilty's locker. The board of review disregarded Mikesell's entire testimony because part of it conflicted with testimony by Seaman Charles E. Johnson, Jr. Mikesell stated Johnson had told him that some of the messcooks were part of a group "concocting stories about an officer." Johnson denied he made any such statement but he admitted he had told a group of messcooks to "stop spreading rumors *about me or anyone else* because it would get them in trouble." (Emphasis supplied.) Johnson also confirmed Mikesell's testimony that Poe and Hilty slept on the same deck of the barracks.

Much more about Hilty and Poe's probable previous association appears in the evidence than just the testimony of Mikesell and Johnson. During the investigation ordered by the board of review, Hilty reaffirmed his trial testimony that he did not know Poe previous to the court-martial and that he first met Poe in Boston. Asked whether he and Poe had "the same circle of friends," he replied: "No, he travelled with a different crowd." How could Hilty know his friends were different from Poe's if he did not know Poe and something of his activities? This statement by Hilty certainly supports the accused's contention that Hilty lied about his previous acquaintanceship with Poe. In addition, there is testimony by four other witnesses. In his affidavit in support of the petition for new trial, Storekeeper Third Class Henry E. O'Neal averred that while serving as master-at-arms in Barracks 348 and as petty officer in Galley 1803, he knew Hilty and Poe. He said he assigned them to the "same sweepers detail, so there is no doubt that they knew each other." At the board of review's investigation he was not asked specifically about these assignments, but in response to other questions, he testified that he thought he saw Hilty and Poe "together in the Master-at-Arms Office at least twice," and that at "one time or another" they "may have unloaded the stores truck." He further testified that, in his opinion, Hilty and Poe "would be lying" if

they indicated they did not know each other because they would "at least have to know each other by sight." Engineman Third Class William H. Robinson had also been a master-at-arms in Galley 1803. He, too, knew Poe and Hilty. In his affidavit he stated that it "would be next to impossible for HILTY not to know POE, especially since they worked together, and slept in the same barracks . . . and on the same deck." At the investigation, he testified that to the best of his knowledge and recollection he saw Poe and Hilty together. He maintained he had "seen them at the same time in the galley and on the way to the Barracks." He expressly recalled seeing them "with 4 or 5 other men coming from and going to work." Engineman Second Class Donald L. Leake also submitted an affidavit in support of the petition for new trial. In it, he indicated that he, too, had been a master-at-arms in Galley 1803 and he knew Poe and Hilty; to the best of his knowledge it "would have been impossible" for them not to know each other. At the investigation, he submitted a statement. In material part it reads as follows:

". . . I was master at arms at Galley 1803, Naval Station, Newport R I from Jan 65—Jan 66. Poe and Hilty worked directly for me for apx one month during the first part of 1965. I cannot swear for a certainity [sic] that Poe and Hilty were good friends, however I recall that these two men, along with Daniels, SA walked from their Barracks, # 348 to the Galley most of the time. Every day from apx 1000—1045 there would be a break for the Galley workers. Whenever it was time to start back to work, I would almost always have to go looking for Poe. Just about every time I would find Hilty, Poe and Daniels sitting on the steps of the garbage house, talking."

Finally, the board of review relied upon the testimony of Seaman Apprentice Lawrence N. Daniel, who was undoubtedly a close friend of Poe's during the time Poe was stationed at Newport. At the investigation, he testified that he did not "think" Poe knew Hilty before the accused's court-martial. Daniel's credibility is in serious doubt. Apart from the fact that he had recanted a similar accusation against the accused, other parts of his testimony impress us as being highly questionable if not untrue. Thus, he denied that he ever told another friend, Roy L. Coleman, that "'[w]henever POE talks about that . . . [the accused's court-martial], forget it, because it's not true'" and that "'POE is lying all the way down the line.'" Coleman testified at the investigation that he heard "so many different things" from Poe about the court-martial that he "just asked" Daniel "what was true," and Daniel told him Poe "was lying all the way, and he was just building up and adding more and more to it." Daniel also denied he had ever told Robin W. Mosley that Poe was lying "about that COMMANDER story," but Mosley testified that the statement had been made to him after Daniel had recanted his own complaint against the accused. True or not, Daniel's equivocal testimony on the crucial question of Poe's association with Hilty does not, in our opinion, outweigh the testimony indicating that such association existed before the accused's court-martial.

That probable false testimony was given at the court-martial is not necessarily ground for grant of a petition for a new trial. It must further appear that the testimony related to a material matter which might have been determined in the accused's favor. United States v Rogers, 14 USCMA 570, 34 CMR 350; see also United States v Hurt, 9 USCMA 735, 27 CMR 3. Earlier we noted the board of review's conclusion that Poe and Hilty's acquaintance with each other was a material matter for the court-martial's consideration in determining their credibility. We agree with that conclusion. Unlike the board of review, however, we are satisfied that the evidence of falsity submitted in connection with the petition for new trial "if presented to another court-martial, would probably produce a re-

**23**

sult more favorable to the accused." United States v Chadd, 13 USCMA 438, 443, 32 CMR 438.

The decision of the board of review is reversed and the petition for new trial is granted. The findings of guilty and the sentence are set aside, and the record of trial is returned to the Judge Advocate General of the Navy.

Judge FERGUSON concurs.