UNITED STATES, Appellee,

v.

David A. BUTNER, Airman Basic, U.S. Air Force, Appellant.

No. 41874.
ACM S25054.

U. S. Court of Military Appeals.

March 14, 1983.

**140**

For Appellant: *Captain Kathleen G. O'Reilly* (argued), *Colonel George R. Stevens, Major Willard K. Lockwood, Captain Russell A. Friemel* (on brief).

For Appellee: *Captain Brenda J. Hollis* (argued), *Colonel James P. Porter, Major Peter Reilly,* USAFR (on brief); *Colonel Kenneth R. Rengert.*

*Opinion of the Court*

COOK, Judge:

Appellant was tried by a special court-martial composed of officer members and, contrary to his pleas, was convicted of a single specification of larceny, in violation of Article 121, Uniform Code of Military Justice, 10 U.S.C. § 921. He was sentenced to a bad-conduct discharge, confinement at hard·labor for 6 months, and forfeiture of $299 pay per month for 6 months. The convening authority approved the sentence. The supervisory authority approved only findings of guilty of wrongful appropriation, but approved the sentence. The Court of Military Review affirmed in an unpub-

lished *per curiam* opinion. We granted review of the following question:

> WHETHER THE MILITARY JUDGE ERRED IN ADMITTING PROSECUTION EXHIBIT 1, A STATEMENT OBTAINED FROM THE APPELLANT INVOLUNTARILY, AND IN ADMITTING THE TESTIMONY OF A1C CADY, WHICH CONSTITUTED INADMISSIBLE DERIVATIVE EVIDENCE.

I

On or about February 4, 1980, a color television set was taken from the first floor dayroom of the Supply Squadron dormitory, building 1326, Carswell Air Force Base, Texas. By February 9, the base security police had received "two [anonymous] crime stop calls relat[ing] to the whereabouts of the television" set. The second caller informed the police that it was at the off-base apartment of appellant and Airman First Class Cady. Pursuant to this information, the security police immediately placed the apartment under surveillance.

By happenstance appellant was well-known to the security police. He had previously been convicted by a special court-martial for, *inter alia,* possession of marijuana at Carswell Air Force Base, and he even worked for a time as an informant for the security police. Exploiting this acquaintance, Technical Sergeant Whalen, the noncommissioned officer in charge of security police investigations, telephoned appellant's apartment. According to appellant, the conversation went like this:

> He said, "How are you doing, Dave?" I said, "I am doing all right." He said, "Can you come on base right now and talk to me?" I said, "I don't really have a way out there." He goes, "Well, how about if I come out there and pick you up and we come back to the base and talk?" I said, "Well, if you want to." I asked him what he wanted to talk about. He goes, "Well, it is about a TV you supposedly have in your apartment." I said, "Oh, really?" He goes, "Yeah, come on, we know it is there; we got two police

officers sitting outside waiting for you." I said, "Yeah, I guess you are right then. I do have it."

Security Police Investigator Patterson, who was listening in on an extension, described the conversation similarly as:

> Words to the effect, Sergeant Whalen knew David and said, "Dave, I need to see you." David said, "Right now?" Sergeant Whalen said, "Yes, right now." Then he said, "And while you are at it, bring the television with you when you come in." There was a pause. Sergeant Whalen said, "Do you know what television?" and Butner said, "Yes." Then he related, Sergeant Whalen related to Airman Butner that there were two Security Policemen outside who would help him bring the television to the base.

Patterson conceded that Whalen did not advise appellant of his rights under Article 31, UCMJ, 10 U.S.C. § 831, on the telephone. Whalen then went to appellant's apartment and, along with the officers already at the scene, recovered the television and apprehended appellant.

Back at the station, appellant was advised of his rights by Staff Sergeant Burciaga, one of the officers who assisted in the apprehension. Appellant waived his rights and agreed to be interrogated. Initially, appellant contended that he found the television set outside behind the barracks. Later he admitted taking it, but contended that he had done the job alone. Because the set was so large, the investigators believed that appellant had an accomplice. According to Sergeant Patterson, Sergeant Whalen interjected at this point, saying:

> "Look, Dave, if you don't tell me who helped you, I am going to hang a snitch coat on your ass that you are never going to get off."

The reference to "snitch coat" meant that word would be spread that appellant was an informant. Sergeant Burciaga's recollection was virtually identical. Appellant also agreed that the threat occurred after he

had confessed sole responsibility for the crime.

Also at about this point, appellant claimed to have requested counsel and to have asserted his right to terminate the interview. The prosecution witnesses uniformly denied that such rights were ever asserted.[1] All parties agree that after Whalen made his threat (and according to appellant only because of it) appellant implicated his roommate Cady. The entire statement was then reduced to writing. At the conclusion of the February 9 interview, appellant was released with instructions to send in Cady on the following Monday, February 11.

Cady appeared on the 11th as requested, was advised of and waived his rights, and confessed to the crime, also implicating appellant. Immediately after confessing to the police, Cady went to see his first sergeant, Master Sergeant Anthony. Cady reasoned that Anthony would learn of the incident eventually and thought it best if he heard it from him first. Anthony was already aware that there was some question concerning the admissibility of evidence in the case, and he advised Cady

> that anything that had transpired up to this point would not be held in any regard so far as I was concerned and so far as I was concerned, what would transpire from this point on would be the only thing that he [Cady] could be held liable for, in association with the TV, and that whatever had happened up to this point didn't make any difference as far as I was concerned.

Anthony then advised Cady of his rights, and Cady again confessed to the offense.

Sometime after the initial interrogation of appellant on February 9, the security police became aware that appellant's initial confessions, and possibly the television itself, could not be used as evidence against him at trial. Therefore, they summoned appellant for another interview. According to Sergeant Burciaga, who contacted appel-

---

1. Our resolution of this case makes it unnecessary for us to decide whether the Government showed that such rights were not asserted.

lant, appellant came in willingly. According to appellant, he told Burciaga that he did not want to come in for a second interview, and he would never have submitted to further interrogation but for Whalen's threat to put the "snitch coat" on him.

Burciaga conducted the second interview alone. He testified that, at the outset of the interview, in addition to the normal rights advisement, he informed appellant:

that the statement that he gave us on the 9th and the TV—and then I said "I am not sure about the TV but I am pretty sure the TV can't be used against you."

He told appellant he would check on the television set and let him know for sure before the statement was ready for signing. Then appellant waived his rights and agreed to be interviewed. After the statement was taken orally, appellant was released while it was being typed. When appellant returned as requested, Burciaga confirmed that the TV could not be used against him and asked him if he was willing to sign the second written statement. Appellant agreed and signed the document. The first sentence of the statement contains the recital:

I fully understand that the statement I made to SSgt Burciaga on 9 Feb 80 and the television that I gave to the Security Police on 9 Feb 80 cannot be used as evidence against me.

■ Appellant, on the other hand, testified that he did not remember being advised, upon his arrival for the second interview, that the February 9 statement and the TV were inadmissible. According to appellant's recollection, it was only after he returned to sign the statement that he was informed that the statement was definitely inadmissible and the TV was possibly inadmissible. According to appellant, Burciaga never did confirm that the TV was inadmissible.[2]

There is no indication in the record that the government agents made any disclaimers to appellant other than those indicated. At trial, the Government made no attempt to introduce any evidence of Sergeant Whalen's initial telephone conversation with appellant. Nor did the prosecution seek to introduce either the television set, appellant's February 9 oral and written confessions, or Cady's February 11 oral or written confessions. The prosecution's evidence consisted almost entirely of appellant's written confession of February 12, 1980, and the testimony of Airman Cady, who testified as a government witness. The defense moved to suppress the latter two items, but the military judge denied the motion without making factual findings or revealing his reasoning.

II

■ Article 31(b) prohibits questioning a suspect without first informing him of his rights against self-incrimination. Conversation designed to elicit a response from a suspect is interrogation. *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *United States v. Dowell,* 10 M.J. 36 (C.M.A.1980); *United States v. Borodzik,* 21 U.S.C.M.A. 95, 44 C.M.R. 149 (1971). There is no question but that Sergeant Whalen's telephone conversation with appellant was designed to elicit incriminating responses and that Article 31 warnings should have been administered. Of course, the prosecution did not attempt to introduce evidence of this conversation.

■ In addition, evidence which is derived from illegal government activity, without an independent source or attenuation, may be subject to exclusion from evidence. *Rawlings v. Kentucky,* 448 U.S. 98,

---

**2.** Since the military judge made no factual findings in this regard, we must construe the evidence "in the light most favorable to the Government" and assume that the warnings preceded the confession. *United States v. Chase,* 1 M.J. 275, 278 (C.M.A.1976); *see United States v. Lowry,* 2 M.J. 55, 59 (C.M.A.1976). Further, in view of the provisional nature of Burciaga's advice about the television set, we are satisfied that both parties reasonably understood that it was only the written and not the oral statement of February 12 which would be used against appellant. Thus, it was unnecessary to warn appellant, when he returned to sign the document, that his oral statement earlier that day could not be used against him.

100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *Silverthorne Lumber Co., Inc. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). There is no question but that the television set was derived from the tainted telephone conversation and would not have been admissible in evidence. Of course, the prosecution did not seek to introduce the television set or evidence of its recovery at trial.

By the same token, both appellant's apprehension on February 9 and his oral and written confessions at the station house later that day were inadmissible, since nothing intervened to break the causative chain set in motion by the unwarned telephone conversation. The mere fact that Article 31 warnings were given at the station house was insufficient in-and-of itself to remove the taint of the illegal arrest. *Dunaway v. New York* and *Brown v. Illinois,* both *supra.* Worse, the February 9 confessions were reinfected by Whalen's ill-considered remark, for it is well-settled that a threat of violence [3] to an accused renders a confession involuntary and consequently inadmissible. *See* 29 Am Jur 2d, Evidence § 568; and 4 Wharton's *Criminal Evidence* § 679 (13th ed. 1973); and the cases cited therein. Of course, no evidence was introduced at trial pertaining to appellant's apprehension or any of his February 9 statements. Thus we come to the testimony of Airman Cady.

Cady was implicated in appellant's tainted February 9 station-house confession. This of course was not the first time Cady's name had been mentioned to the security police in connection with this case, as at least one of the tipsters indicated that the television set could be found at his apartment. Thus, it is obvious that sooner or later the security police would have gotten around to interviewing Cady. Recently, in *United States v. Kozak,* 12 M.J. 389 (C.M.A. 1982), we adopted "the so-called inevitable discovery rule." *Id.* at 391–92, 393. However, we decline to apply such a rule to Cady's testimony since, absent appellant's tainted confession, it is not at all clear that Cady would inevitably have implicated appellant. Indeed, we note that appellant himself initially assumed total responsibility for the crime—perhaps Cady would have held out longer. Thus, in order for Cady's testimony to be admissible, there must appear to be some break in the causal chain which dissipated the taint. We find two such breaks.

In *Wong Sun v. United States, supra,* federal agents elicited an oral statement from defendant Blackie Toy after forcing entry into his laundry shop and living quarters. The agents placed Toy under arrest without probable cause, and Toy's statement concerning his participation in the sale of narcotics led the agents to question Johnny Yee. Yee stated that heroin had been brought to him earlier by Toy and one known as "Sea Dog." Toy identified Wong Sun as "Sea Dog." Wong Sun was then arrested, arraigned, and ultimately released on his own recognizance. Several days later, he returned voluntarily and made an unsigned statement. The Supreme Court ruled that Toy's declarations and certain contraband taken from Yee were fruits of the agents' illegal action and should not have been admitted as evidence against Toy. *Id.* at 484–88, 83 S.Ct. at 415–17. Toy's statement did not result "from 'an intervening independent act of free will,'" and "was [not] sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Id.* at 486, 83 S.Ct. at 416 (footnote omitted). With respect to Wong Sun's confession, however, in view of his arraignment and release on his own recognizance, and of his return voluntarily several days later to make the statement, the connection between his unlawful arrest and the statement "had 'become so attenuated

---

**3.** It hardly seems to matter whether Whalen threatened personally to do violence to appellant or whether the threat was merely to provoke others to harm him.

as to dissipate the taint.' *Nardone v. United States,* 308 U.S. 388, 341 [60 S.Ct. 266, 267, 84 L.Ed. 307]." *Id.* at 491, 83 S.Ct. at 419. Thus, Wong Sun's confession was admissible.

 Cady's position in the instant case is analogous to Wong Sun's. At the time he reported for interrogation, Cady was not in confinement, had never been apprehended, and had not even been contacted directly by the security police. He merely responded to a request that he come in, which was conveyed by his roommate, appellant. Though it is not clear exactly when appellant told Cady the security police wanted to see him, it is obvious Cady had an opportunity to contemplate the request; nothing prevented him from seeking legal advice in the interim. Like Wong Sun, Cady came to the decision to report to the police. We hold that this independent act of free will was sufficient to sever the causative chain. *See United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); *Wong Sun v. United States, supra.* Moreover, an equally valid break in the chain occurred immediately thereafter when Cady sought out his first sergeant in order to confess. Thus, the military judge was correct in receiving Cady's testimony in evidence. There only remains the question whether appellant's February 12 written statement was tainted.

 Just because an accused has made one admission which was tainted, it does not automatically follow that the prosecution will be forever precluded from introducing his subsequent admissions. In *United States v. Seay,* 1 M.J. 201 (C.M.A.1975), then Chief Judge Fletcher enumerated several factors which should be weighed in resolving whether the taint of an earlier interrogation had been overcome. They include

the time lapse between the questioning periods, whether the accused was again questioned by the individual who obtained the prior inadmissible statement, whether the accused himself made an acknowledgement that his prior admissions did not influence his decision to incriminate himself again, and whether the interrogator relied upon the prior admissions in seeking a subsequent statement. Further, he cautioned that

only the strongest combination of these factors would be sufficient to overcome the presumptive taint which attaches once the Government improperly has secured incriminating statements or other evidence. *United States v. Wimberley,* ... [16 U.S.C.M.A. 3, 36 C.M.R. 159 (1966)]. In addition to rewarning the accused, the preferable course in seeking an additional statement would include advice that prior illegal admissions or other improperly obtained evidence which incriminated the accused cannot be used against him.

*Id.* at 204 (footnote omitted).

 It is evident that the law-enforcement authorities here attempted to heed Judge Fletcher's advice. In the totality of circumstances, we are satisfied that they succeeded. First, a three-day interval, during which time appellant was not in custody, separated appellant's tainted confession and his ultimate confession. In some cases, these facts alone may be sufficient to purge a taint. *See Rawlings v. Kentucky, Dunaway v. New York,* and *Brown v. Illinois,* all *supra.* *See also United States v. Wynn,* 13 M.J. 446 (C.M.A.1982). Not being in custody, appellant, who had already been advised of his right to counsel, was able to seek legal advice. That he declined to do so prior to submitting to the second interview was *his choice.* Second, although the latter interrogation was also conducted by Sergeant Burciaga, we think it significant that it was not Burciaga whose conduct was objectionable.

Third, the corrective warnings, while perhaps not perfect, were adequate. It is true, for example, that Burciaga did not specify which of the *three* February 9 confessions (the initial telephone conversation and the subsequent oral and written confessions made at the station) would not be used against appellant. Nevertheless, in the context in which the advice was given, we are satisfied that appellant reasonably under-

stood that *none* of his previous statements would be used. Further, in view of our conclusion that Cady's statement to the security police on February 11 was an act of free will, it was not necessary that Burciaga advise appellant that Cady could not be a witness against him.

Finally, we note that Sergeant Burciaga failed to "take off" the "snitch coat," *i.e.,* he failed specifically to inform appellant that the threat was no longer operative. However, it was obvious that the threat was no longer operative, since all parties agreed that it occurred *after* appellant confessed and was directed only at the identity of the accomplice. Once that identity was disclosed, as it was almost immediately, the threat expired. In addition, the very first recital that appears on appellant's February 12 confession is: Sergeant Burciaga "told me, and I understand that: I have the right to remain silent, that is, say nothing at all." Thus there appears to be no validity to appellant's claim that on February 12 he still felt compelled by Whalen's threat to submit to a reinterview.

In sum, the very nature of the threat itself, together with the rewarnings given by Burciaga, the passage of time, and the fact that appellant was not in confinement, persuade us that the taint of the illegal police activity was dissipated when appellant confessed on February 12. Accordingly, the military judge did not err in receiving evidence of that confession.

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge EVERETT concurs.

FLETCHER, Judge (dissenting):

The Air Force Court of Military Review issued a pro forma opinion in this case affirming appellant's conviction. In view of the sheer number of police investigatory improprieties in this case and the impact such practices might have on the military justice system, I find its reticence surprising.

The question I will address is the admissibility of Cady's testimony at appellant's court-martial. In *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), the Supreme Court upheld the admissibility of testimony of a witness discovered by the police as a result of a statement made by an accused not properly advised of his *Miranda*[1] rights. *See United States v. Leiffer,* 13 M.J. 337, 346–47 (C.M.A.1982) (Fletcher, J., concurring in the result); *United States v. Ricks,* 2 M.J. 99 (C.M.A. 1977). However, the Court made clear that a mere violation of the prophylactic standards of *Miranda* was substantively different from police conduct which compels an accused to involuntarily incriminate himself. *Id.* at 439–46, 94 S.Ct. at 2361. Here appellant was compelled under a threat of violence to identify his accomplice Cady and also provide a statement implicating Cady in the crime. This situation is materially different from that presented in *Michigan v. Tucker, supra,* and accordingly, its rationale does not dictate the admissibility of the challenged testimony of Cady in the present case.

The majority opinion partially intones the litany of improper police conduct in this case and the inadmissibility of some evidence secured as a result thereof. In my opinion, it stops too short. The entire course of police conduct in this case reflects genuine compulsion reminiscent of the historical proceedings against which the Fifth Amendment was directed. *See Michigan v. Tucker, supra.* Particularly offensive is the fact that the police compelled appellant to incriminate his accomplice and in turn used this information to derive testimony from the accomplice against appellant at his court-martial. This was not the posture of the discovered witness in *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), nor was the link between the police illegality and the challenged testimony so direct and flagrant. On due-process grounds, I would hold the testimony of Cady was inadmissible and reverse appellant's conviction. *See Mincey v. Arizona,* 437 U.S. 385, 396–402, 98 S.Ct. 2408, 2415–19, 57 L.Ed.2d 290 (1978).

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).