**UNITED STATES, Appellee,**

v.

**Sergeant Clarence A. RAVENEL,
247–06–4813, United States
Army, Appellant.**

**CM 446046.**

U.S. Army Court of Military Review.

25 April 1985.

Lieutenant Colonel Arthur L. Hunt, JAGC, Captain Thomas J. Feeney, JAGC, and Captain Bernard P. Ingold, JAGC, were on the pleadings for appellant.

Colonel James Kucera, JAGC, Lieutenant Colonel Adrian J. Gravelle, JAGC, Captain Garreth E. Shaw, JAGC, and Captain Thomas J. Benjamin, JAGC, were on the pleadings for appellee.

Before SUTER, RABY, and NAUGHTON, Appellate Military Judges.

## OPINION OF THE COURT

RABY, Senior Judge.

In a trial by a military judge sitting as a general court-martial, the appellant pled not guilty to unpremeditated murder and adultery but was found guilty (by exceptions and substitutions) of involuntary manslaughter and adultery. He was sentenced to a bad-conduct discharge, confinement at hard labor for two years, total forfeitures, and reduction to the grade of Private (E–1).

Appellant asserts that the military judge committed error by failing to suppress two incriminating statements which were the product of unwarned admissions previously made by appellant during police interrogation. He also asserts that his sentence is too harsh and is inappropriate.

### I. Admissibility of Appellant's Pretrial Statements

#### a. The Relevant Facts.

Appellant[1] had been maintaining an adulterous relationship with the wife of the victim, Staff Sergeant (SSG) C. Sergeant C apparently was unaware of his wife's infidelity.

On Christmas Day, 25 December 1983, appellant, his friend, Specialist Four (SP4) G, and several other guests were invited to Christmas dinner at SSG C's home. The other guests departed early that evening, but appellant and SP4 G remained. At about 9:00 p.m., a domestic quarrel erupted between SSG C and his wife concerning some missing recorder tapes. SSG C had begun to beat his wife in the kitchen when appellant entered and told him to stop. Appellant told Mrs. C to get her children and go to the military police station. Mrs. C left the kitchen and started to go upstairs. SSG C grabbed his wife and the appellant pulled SSG C to the floor and used a form of wrestling hold in order to subdue him. Mrs. C got her children and brought them downstairs. When SP4 G took Mrs. C and the children to the military police station, appellant was holding SSG C

and appeared to be on top of him. Appellant maintained this hold for 2 to 3 minutes to insure that SSG C did not follow Mrs. C. Appellant then left the apartment, taking a baseball bat to prevent SSG C from "coming after [him] with it." Appellant went directly to the military police station, arriving within 1 or 2 minutes of SP4 G and Mrs. C.

Apparently based on information voluntarily supplied to the military police by SP4 G and Mrs. C, two military policemen were dispatched to SSG C's apartment to apprehend him for assaulting Mrs. C. They found the body of SSG C lying inside the door. It appeared to one of the military policemen that SSG C had a pulse and was breathing. When the paramedical unit arrived on the scene about 3 or 4 minutes later, SSG C was not breathing and had no pulse. SSG C died of asphyxia due to strangulation. Strangulation was caused when appellant maintained an air-denying wrestling hold on SSG C for a duration of several minutes.

When the Criminal Investigation Command (CID) agents initially interviewed appellant, they were collectively aware that SSG C had been involved in a domestic disturbance, that appellant, SP4 G, Mrs. C, and her children had voluntarily arrived at the military police station, that these individuals believed SSG C was alive when they left the apartment, that SSG C was later found dead of unknown causes and his body showed no obvious signs of trauma, and that appellant was the last person to leave SSG C's apartment.

Two CID agents initiated a witness interview of the appellant on 26 December 1983. When this initial interview began, the CID agents did not suspect appellant of any criminal misconduct and they neither advised him of his rights pursuant to Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831 (1982) [hereinafter cited as

---

1. On 25 December 1983, appellant was about 28½ years old, a noncommissioned officer (sergeant) with over 8 years' service, and a high school graduate with a relatively high general/technical score of 120.

UCMJ], nor informed him that SSG C was dead.

During this initial witness interview, appellant told the agents that he had been invited to SSG C's home for Christmas dinner and that when an altercation occurred between SSG C and his wife, appellant told SSG C to leave Mrs. C alone. Mrs. C got away from her husband and started upstairs, but SSG C followed and caught her. In his attempt to aid Mrs. C, appellant grabbed SSG C in a "full-Nelson" hold. Appellant then told SP4 G to take Mrs. C and the children to the military police station, held SSG C for a short period giving them time to leave, released the hold on SSG C, and exited the quarters.

Before appellant's initial interview was terminated, one of the CID agents conducted a consent search of appellant's automobile and found the baseball bat which appellant had taken from SSG C's apartment. The agent then interviewed SP4 G as a witness. Specialist G made a statement which basically corroborated the statement previously made by appellant.

Following the car search and the interview with SP4 G, appellant's initial interview was terminated. The agents then discussed the information they had obtained, concluded that they "really didn't know what [they] had," and decided to warn appellant of his rights as a suspect under Article 31, UCMJ, and continue to interview him. Appellant was informed of his rights to counsel under Article 31, waived his rights, and executed a sworn statement on 26 December 1983. This statement was substantially similar to appellant's initial, unwarned statement rendered earlier that day, but was more detailed. Three days later, on 29 December 1983, appellant was again warned of his rights, he again waived these rights, and he was reinterviewed. At this time, appellant again discussed his version of the incident, orally described the hold he had used on SSG C, and attempted to demonstrate this hold for the agents.

b. The Military Judge's Findings.

The military judge found that the appellant was not a suspect at the beginning of the initial interview on 26 December 1983. However, the judge found that the agents knew or should have known that the appellant was a suspect when he told them he had held SSG C in a "full-Nelson." The military judge also found that there was "no particularly relevant and clearly, no prejudicial information obtained from the accused" in the time between the statement about the "full-Nelson" hold and the termination of the initial interview by the agents. He also found that the appellant was properly warned before the second interview and voluntarily waived his rights, holding that the initial, oral statement made by appellant did not taint the sworn statement made during the accused's subsequent interview on 26 December 1983.

c. The Question of Admissibility.

■ In determining whether an accused is a suspect at the time of an interview and is, therefore, entitled to receive those warnings required by law, the Court must consider the totality of the circumstances, as the facts and circumstances of each case are controlling. See United States v. Anglin, 40 C.M.R. 232, 235 (C.M.A.1969); United States v. Leiffer, 13 M.J. 337, 343 (C.M. A.1982).

■ In our view, use of a two-pronged test is appropriate. First, the beliefs of the agents conducting the interview should be considered. Clearly, as soon as the agents suspect an accused of committing an offense, warnings are required. United States v. Rice, 3 M.J. 1094, 1100 (N.C.M. R.), pet. denied, 4 M.J. 163 (C.M.A.1977). Applying a subjective test, we find that the agents acted in good faith and did not, in fact, suspect the appellant until after they terminated his initial witness interview and professionally interpreted the information they had collected. However, having applied this subjective test, we must now apply an objective test to determine whether a warning was required prior to the point at which the appellant became a suspect in the minds of these particular

agents. In other words, considering the totality of the circumstances, we must decide whether the agents should reasonably have believed sooner that appellant had committed an offense and, thus, was a suspect. *See United States v. Anglin*, 40 C.M.R. at 236. For judicial convenience, these two tests are usually combined.[2] *United States v. Morris*, 13 M.J. 297, 298 (C.M.A.1982); *United States v. Lacy*, 16 M.J. 777, 780 (A.C.M.R.1983), *pet. denied*, 17 M.J. 309 (C.M.A.1984). Applying the objective test to the operative facts, we conclude that the military judge was correct in finding that the earliest point at which the agents should have suspected the accused was when he told them, during the initial interview, that he grabbed SSG C in a "full-Nelson" hold.[3] Thus, all portions of appellant's initial, oral statement, up to and including his revelation about using a "full-Nelson" hold, were admissible and all subsequent portions thereof were properly excluded by the military judge.

We disagree with the military judge's conclusions that no portion of the information obtained during the initial interview after the appellant admitted that he put a "full-Nelson" hold on SSG C was "particularly relevant" and that "no prejudicial information" was obtained from the accused during this period. In view of the expert medical testimony of record, it was both relevant and prejudicial, in a general sense, when the appellant admitted that he maintained his hold on SSG C for a "short period" to ensure Mrs. C's successful exit of the apartment. However, this fact does not adversely affect the outcome of this case, especially as the military judge clearly recognized that this portion of appellant's statement was inadmissible.

The only significant question remaining is whether the appellant's initial, unwarned admissions create a presumption which destroys the validity and efficacy of appellant's subsequent two rights waivers, rendering the statements made following such waiver involuntary and in violation of Article 31, UCMJ, 10 U.S.C. § 831. The answer is no.

█ It is now well recognized that Article 31 was intended to parallel the fifth amendment privilege and to provide servicemembers with "the same rights secured to those of the civilian community under the Fifth Amendment ...—no more and no less". *United States v. Armstrong*, 9 M.J. 374, 380 (C.M.A.1980) (citing *United States v. Eggers*, 11 C.M.R. 191, 195 (C.M.A.1953)); *accord United States v. Harden*, 18 M.J. 81, 82 (C.M.A.1984); *see also United States v. Jones*, 19 M.J. 961, 967 (A.C.M.R.1985) ("[T]he objectives underlying Article 31(b) correspond almost exactly to the objectives of *Miranda*. The only difference between the objectives of Article 31(b) and *Miranda* is that Article 31(b) is also designed to insulate a service member from the subtle pressure created by rank or duty to respond to an incriminating question.") (footnote omitted). Recently, in the case of *Oregon v. Elstad*, —— U.S. ——, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the U.S. Supreme Court rejected the presumption that all subsequent statements are tainted once "the cat is out of the bag," finding, rather, that there is no necessary causal connection between a confession extracted absent *Miranda*[4] warn-

---

2. Combined, the tests are simply stated: to determine if a person is a suspect, the test is whether at the time of the interview, considering all the facts and circumstances, the government interrogator *believed or reasonably should have believed* that the one interrogated committed an offense. (Emphasis supplied.)

3. We find this case distinguishable from the facts in both *United States v. Anglin*, 40 C.M.R. 232, and *United States v. Lacy*, 16 M.J. 777. The contents of the initial reports given to the CID about the nature of the incident and the condi-

tion of SSG C's body, combined with the voluntary appearances of appellant, SP4 G, Mrs. C, and Mrs. C's children at the military police station, created a deceptive atmosphere. This atmosphere lulled the agents into a false evaluation concerning the appellant's potential criminal culpability, which was corrected only after a substantial amount of questioning during which the appellant was considered a mere witness.

4. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

ings and a subsequent confession preceded by proper *Miranda* warnings. *Oregon v. Elstad,* at —— – ——, 105 S.Ct. at 1294–95. The accused in *Oregon v. Elstad* made an incriminating statement absent prior rights warnings during a custodial interrogation. Following subsequent *Miranda* warnings at the station house, the accused waived his rights and executed a written confession. In determining that the written confession was not tainted by the prior unwarned statement and was, therefore, admissible, the Supreme Court held:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.[5]

*Oregon v. Elstad,* at ——, 105 S.Ct. at 1293.

■ We find that the principles expressed in *Oregon v. Elstad* apply with equal force to the situation in the military in which a servicemember makes an incriminating statement absent prior rights warnings, then subsequently receives proper warnings consistent with Article 31(b), UCMJ, and *United States v. Tempia,* 37 C.M.R. 249 (C.M.A.1967), voluntarily and affirmatively waives these rights, and freely makes another incriminating statement. In such instances, there should be no presumption of taint and the second, uncoerced statement should not be irretrievably lost to the fact finder. *Cf. United States v. Armstrong,* 9 M.J. 374; *but cf. United States v. Remai,* 19 M.J. 229, 233 (C.M.A.1985) (in dictum, the court suggests

that violations of Article 31 occurring in the military context should be accorded the same treatment which the Supreme Court ultimately awards coerced confessions). We believe that the test fashioned by the Supreme Court in *Oregon v. Elstad* will fully protect the servicemember's constitutional and statutory rights against self-incrimination, which are embodied in the fifth amendment and Article 31, respectively. While we agree with the opinion of the Court of Military Appeals in *United States v. Remai,* 19 M.J. 229, and the opinion of this court in *United States v. Jones,* 19 M.J. 961, that subtle pressures exist in military society for which there may be no civilian counterpart, we believe that the prophylactic test enunciated in *Oregon v. Elstad* will be completely sensitive to and responsive to the totality of the circumstances of a given case. We are confident that the proper application of this new test will adequately protect a servicemember from those "subtle pressures" which have concerned the military appellate court system. Accordingly, we adopt the *Oregon v. Elstad* test and will apply it to the facts of this case.

■ Based upon the evidence of record, we find that appellant's initial statement was freely and voluntarily given and that it was not the product of coercion, undue influence, unlawful inducement, or any form of subterfuge initiated by the interrogating agents in an attempt to circumvent appellant's fifth amendment and Article 31 rights against self-incrimination. We find, therefore, that the only legal impediment to the admission of that portion of appellant's initial, unwarned statement following his mention of the "full-Nelson" hold was the procedural failure to administer the required warnings. Additionally, we find that no other circumstances existed which were calculated to undermine appellant's ability to exercise his free will with respect either to the initial, unwarned statement or to the subsequent statements made by ap-

---

5. When neither the initial nor the subsequent admission is coerced, little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the fact finder. *Oregon v. Elstad,* —— U.S. at ——, 105 S.Ct. at 1294.

pellant following proper rights warnings and express, voluntary waiver thereof. Accordingly, we find this assignment of error to be without merit.

### II. *Disposition of Other Asserted Errors*

We have considered the issue personally raised by appellant and briefed by his counsel and find it to be without merit.

The findings of guilty and the sentence are affirmed.

Chief Judge SUTER and Judge NAUGHTON concur.