**UNITED STATES, Appellee,**

v.

**Clarence A. RAVENEL, Sergeant, U.S. Army, Appellant.**

No. 52,627.

U.S. Court of Military Appeals.

Aug. 15, 1988.

For appellant: *Captain David W. Sorensen* (argued), *Colonel Brooks B. La Grua, Lieutenant Colonel Paul J. Luedtke, Captain Craig E. Teller* (on brief), *Lieutenant Colonel Arthur L. Hunt, Major Eric T. Franzen, Captain Thomas J. Feeney, Captain Bernard P. Ingold, Captain Keith Sickendick.*

For appellee: *Captain Vito A. Clementi* (argued), *Colonel James Kucera, Lieutenant Colonel Gary F. Roberson, Captain Erik M. Stumpfel* (on brief), *Colonel Norman G. Cooper, Lieutenant Colonel Adrian J. Gravelle, Captain Samuel J. Rob.*

*Opinion*

EVERETT, Chief Judge:

After appellant had contested charges alleging unpremeditated murder and adultery, the military judge sitting alone as a general court-martial convicted him of involuntary manslaughter and adultery, in violation of Articles 119 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 919 and 934, respectively. Appellant was sentenced to a bad-conduct discharge, confinement for 2 years, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved these findings, and the Court of Military Review affirmed. 20 M.J. 842 (1985).

In due course, this Court granted review of these two issues:

I

WHETHER THE ARMY COURT OF MILITARY REVIEW ERRED IN APPLYING THE PRINCIPLES OF *OREGON v. ELSTAD*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), TO MILITARY PRACTICE AND CONCLUDING ON THE FACTS OF THIS CASE THAT APPELLANT'S INCRIMINATING STATEMENTS WERE NOT THE INVOLUNTARY PRODUCT OF ADMISSIONS MADE DURING CID QUESTIONING BEFORE HE WAS PROPERLY ADVISED OF HIS RIGHTS.

II

WHETHER ACCUSED ESTABLISHED AS A MATTER OF LAW "DEFENSE OF ANOTHER" AND IS THEREFORE

ENTITLED TO A VERDICT OF NOT GUILTY OF MANSLAUGHTER.[1]

## I

## A

At the invitation of Staff Sergeant David Covin—who, presumably, was unaware of an adulterous relationship between his wife and Ravenel—appellant spent Christmas Eve at the Covin residence. On Christmas Day, several people dined there, including Ravenel and his friend, Specialist Four Robert Gaines.

By 9:00 p.m., all guests had departed except Ravenel and Gaines. Covin—who had been drinking rather heavily—became irate with his wife over a missing tape and followed her into the kitchen. Ravenel entered the kitchen shortly thereafter when he heard sounds of a disturbance from that room, and he found Covin beating his wife about her head and slamming her head against the top of the kitchen counter.

Ravenel promptly intervened. He told Covin to stop and, this failing, pulled him away. Ravenel told Mrs. Covin to get her two children, who were upstairs at the time, and go to the military police station. When she started to do so, Covin freed himself from Ravenel and grabbed his wife; Ravenel dragged Covin away again, pulled him "to the floor and used a form of wrestling hold in order to subdue him." *United States v. Ravenel, supra* at 843. After Mrs. Covin had retrieved her children and brought them downstairs, Ravenel told Gaines to take them to the military police station. Mrs. Covin was extremely afraid of her husband at the time; even while leaving the house, she was fearful that he would get loose and pursue her to do her more harm.

When Gaines and the Covins left, Ravenel was holding Sergeant Covin "and appeared to be on top of him." He held Covin for 2 or 3 minutes more, to give the group time to get away. Then he, too, left

the apartment. As he departed, he took a baseball bat with him "to prevent" Covin "from coming after ... [him] with it." Then, he "went directly to the military police station, arriving within" a minute or two of the others. *Id.* at 843.

On the basis of information provided by Gaines and Mrs. Covin, "two military policemen were dispatched to" the Covin residence "to apprehend" Sergeant Covin "for assaulting" his wife. There, they found Covin "lying inside the door." One of the MPs believed that Covin "had a pulse and was breathing"; but, by the time a paramedic unit arrived 3 or 4 minutes later, neither was the case.

Agents of the Criminal Investigation Command (CID) were summoned and investigated the scene. Later, they interviewed Gaines, Mrs. Covin, and Ravenel. When they first interviewed Ravenel, the agents "were collectively aware that SSG C[ovin] had been involved in a domestic disturbance, that appellant, SP4 G[aines], Mrs. C[ovin], and her children had voluntarily arrived at the military police station, that these individuals believed SSG C[ovin] was alive when they left the apartment, that SSG C[ovin] was later found dead of unknown causes and his body showed no obvious signs of trauma, and that appellant was the last person to leave SSG C[ovin]'s apartment." *Id.* at 843.

When Ravenel's interview began, the agents questioned him as a witness. They testified—and both the military judge and the Court of Military Review found as a fact—that at the time they "did not suspect" Ravenel "of any criminal misconduct." *Id.* Accordingly, they did not advise him of his rights pursuant to Article 31(b), UCMJ, 10 U.S.C § 831(b); or inform him that Sergeant Covin was dead. Appellant recited the events at the apartment, including the fact that he had restrained Covin "in a 'full-Nelson' hold" and that he maintained this hold on Covin while the others left and for a few minutes there-

1. This issue was specified by this Court and was not raised or, presumably, considered by the Court of Military Review.

after. During the interview, an agent "conducted a consent search of" Ravenel's car "and found the baseball bat which" he had taken with him from the Covin apartment. An interview with Gaines essentially corroborated Ravenel's version.

At this point, the agents all huddled to discuss "the information they had obtained." They "concluded that they 'really didn't know what ... [they] had,' and decided to warn Ravenel of his rights as a suspect under Article 31, UCMJ, and continue to interview him." *Id.* at 844. Having been read these rights, Ravenel waived them "and executed a sworn statement ... substantially similar to" but in more detail than his earlier, unwarned oral recitation. Three days later, Ravenel again was interviewed; after again waiving his rights, he executed another sworn statement "and attempted to demonstrate" the hold he had used on Sergeant Covin. *Id.* at 844.

### B

The Court of Military Review decided that Ravenel was not a suspect until, during his first interview, he told the investigators that he had held Covin "in a 'full-Nelson' hold." *Id.* at 845. Citing the lead opinion in *United States v. Morris*, 13 M.J. 297, 298 (C.M.A.1982) (footnote omitted)—in which Judge Fletcher stated that "[t]he test to determine if a person is a suspect is whether, considering all facts and circumstances at the time of the interview, the government interrogator believed or reasonably should have believed that the one interrogated committed an offense"—the court found that the agents neither believed nor reasonably should have believed that appellant had killed Covin until he revealed the fact of his wrestling hold. In this regard, the *Ravenel* court specifically noted:

> The contents of the initial reports given to the CID about the nature of the incident and the condition of SSG C[ovin]'s body, combined with the voluntary appearances of appellant, SP4 G[aines], Mrs. C[ovin], and Mrs. C[ovin]'s children at the military police station, created a

deceptive atmosphere. This atmosphere lulled the agents into a false evaluation concerning the appellant's potential criminal culpability, which was corrected only after a substantial amount of questioning during which the appellant was considered a mere witness.

20 M.J. at 845 n.3. Accordingly, the details of Ravenel's initial interview, up to the point immediately after his mention of the "full-Nelson," were admissible, notwithstanding the investigator's omission to warn him pursuant to Article 31; but his subsequent remark during the initial interview "that he maintained his hold ... for a 'short period' " was inadmissible.

The Court of Military Review observed that "[t]he only significant question remaining is whether ... [the] initial, unwarned admission created a presumption which destroys the validity and efficacy of appellant's subsequent two rights waivers, rendering the statements made following such waiver involuntary and in violation of Article 31, UCMJ, 10 U.S.C. § 831." *Id.* at 845. The *Ravenel* court noted that, in dicta in *United States v. Remai*, 19 M.J. 229, 233 (C.M.A.1985), this Court had "suggest[ed] that violations of Article 31 occurring in the military context should be accorded the same treatment which the Supreme Court ultimately awards coerced confessions." 20 M.J. at 846.

However, after an analysis of the then-recent decision of the Supreme Court in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and its applicability to the military justice system in the context of Article 31, the court below held that no such presumptive taint had been created. In its view, proper application of the new standard set out in *Elstad* "will be completely sensitive to and responsive to the totality of the circumstances of a given case" and so, "will adequately protect a servicemember from those 'subtle pressures' which have concerned the military appellate court system." 20 M.J. at 846. The correctness of this application of *Ore-*

*gon v. Elstad, supra,* has been questioned in this appeal.[2]

## C

In *Oregon v. Elstad, supra,* the Supreme Court held, over sharp dissent (6–3), that failure of investigators to give the warning required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before taking an initial statement from a suspect would not, of itself, presumptively taint a suspect's subsequent waiver of his rights, if preceded by the required warning, and it would not preclude reception in evidence of ensuing admissions or confessions. The linchpin of the majority's rationale is its distinction between *actually* compelled testimony, prohibited by the Fifth Amendment, and a legal *presumption* of compelled testimony arising from failure to give the required *Miranda* warnings.

In an earlier line of cases, the Supreme Court had drawn this same distinction in the context of using a defendant's prior statements for purposes of impeachment. The Court in *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), ruled that a confession obtained in violation of *Miranda,* but otherwise voluntary, could be used to impeach the defendant's inconsistent trial testimony, even though the confession was inadmissible in the prosecution's case-in-chief. Later, in *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), the Court made clear that *"any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law ..." *Id.* at 398, 98 S.Ct. at 2416.

Applying its distinction between an unwarned statement and an involuntary statement, the Court reasoned in *Elstad* that use of a compelled confession violates the Constitution itself; but use of a confession obtained in violation of *Miranda* —but oth-

erwise voluntary—does not do so, because "[t]he *Miranda* exclusionary rule ... sweeps more broadly than the Fifth Amendment itself." *Oregon v. Elstad, supra,* 470 U.S. at 306, 105 S.Ct. at 1291; *see also* 306 n. 1, 105 S.Ct. 1292 n. 1.

## II

### A

If the events surrounding the series of interrogations in this case had involved a civilian suspect and civilian police officers in a civilian setting, there is no doubt that Ravenel's post-rights warnings statements would have been admissible against him during the prosecution's case-in-chief. As in *Oregon v. Elstad, supra,* no hint exists that the first, unwarned statement was the product of actual coercion or other compulsion sufficient to override the suspect's free will. Thus, in the absence of any such coercion or compulsion surrounding the subsequent, warned interrogations, the later statements would not be presumptively tainted by the first. One may not fully agree with the Supreme Court's rationale in *Elstad,* but application of the legal principles discussed therein leaves no doubt that Ravenel's post-warnings statements, which were not actually compelled or coerced, were constitutionally obtained.

The real issue here, of course, is whether the protection afforded by Article 31(b) of the Uniform Code precisely parallels that of the Fifth Amendment—which was the subject of the Supreme Court's interpretation in *Oregon v. Elstad, supra.* If it does, then we are bound by the interpretation of the High Court in that case. If it does not, however, then this Court has a separate duty to interpret Article 31(b) to determine whether, thereunder, a presumptive taint from the first, unwarned statement carried over to the subsequent, warned statements.

---

**2.** Though defense and government appellate counsel have devoted considerable attention in their final briefs in this Court to debating the ruling of the military judge and the Court of Military Review that the agents neither knew nor reasonably should have known that Ravenel had committed a crime, this Court has not granted review of that aspect of the lower court's decision.

## B

The Fifth Amendment prescribes, in part: "No person ... shall be compelled in any criminal case to be a witness against himself ... " Similarly, Article 31(a) of the Uniform Code stipulates: "No person subject to this chapter may compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him." In fact, so similar are these provisions that this Court has held that, substantively, they are coextensive. As we reiterated in *United States v. Armstrong*, 9 M.J. 374, 380 (C.M.A.1980), quoting from *United States v. Eggers*, 3 U.S.C. M.A. 191, 195, 11 C.M.R. 191, 195 (1953):

Indeed, only two years after the enactment of the Code the Court recognized, "Undoubtedly, it was the intent of Congress in this division of the Article [Article 31(a)] to secure to persons subject to the Code the same rights secured to those of the civilian community under the Fifth Amendment to the Constitution of the United States—no more and no less."

*Accord United States v. Harden*, 18 M.J. 81, 82 (C.M.A.1984); *see United States v. Lloyd*, 10 M.J. 172 (C.M.A.1981).

In order to make the Fifth Amendment's proscription against compelled self-incrimination more meaningful, the Supreme Court mandated in *Miranda v. Arizona*, 384 U.S. at 444, 86 S.Ct. at 1612, that any custodial interrogation of a criminal suspect be preceded by a police warning to the suspect "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." The Court reasoned that, absent such warnings, any resulting statement should be deemed presumptively coerced in violation of the Fifth Amendment.

As the Supreme Court recognized in *Miranda*, the Uniform Code of Military Justice had long before "provided that no suspect may be interrogated without first being warned of his right not to make a statement and that any statement he makes may be used against him." *Id.* at

489, 86 S.Ct. at 1635 (footnote omitted), citing Article 31(b). The language of Article 31(b) is markedly similar to the substance of the *Miranda* warnings—just as Article 31(a) is to the Fifth Amendment. However, this similarity of phraseology does not necessarily mean, as is the case with Article 31(a) and the Fifth Amendment, that they should be considered precisely the same in scope. Indeed, the fact that enactment of Article 31(b) in 1951 preceded by many years the pronouncement in *Miranda* clearly invites examination of the purpose Congress sought to serve through Article 31(b).

This is not an unfamiliar task to this Court: For instance, in *United States v. Armstrong, supra* at 378, we observed:

The purpose of Article 31(b) apparently is to provide servicepersons with a protection which, at the time of the Uniform Code's enactment, was almost unknown in American courts, but which was deemed necessary because of subtle pressures which existed in military society. *See* Index and Legislative History, Uniform Code of Military Justice, Hearings Before a Subcommittee of the Committee on Armed Services, House of Representatives, 81st Cong., 1st Sess., H.R. 2498, pp. 984–85 (1949). Conditioned to obey, a serviceperson asked for a statement about an offense may feel himself to be under a special obligation to make such a statement. Moreover, he may be especially amenable to saying what he thinks his military superior wants him to say—whether it is true or not. Thus, the serviceperson needs the reminder required under Article 31 to the effect that he need not be a witness against himself. *See id.* at 990.

Three months later, in *United States v. Duga*, 10 M.J. 206, 209 (C.M.A.1981), we quoted from an opinion delivered nearly three decades before in *United States v. Gibson*, 3 U.S.C.M.A. 746, 752, 14 C.M.R. 164, 170 (1954), as follows:

Careful consideration of the history of the requirement of warning, compels a conclusion that its purpose is to avoid

impairment of the constitutional guarantee against compulsory self incrimination. Because of the effect of superior rank or official position upon one subject to military law, the mere asking of a question under certain circumstances is the equivalent of a command. A person subjected to these pressures may rightly be regarded as deprived of his freedom to answer or to remain silent.

Again, one year later, Judge Cook, on behalf of a unanimous Court in *United States v. Lewis*, 12 M.J. 205, 206–07 (C.M.A.1982), wrote clearly and succinctly:

The special relationship in the military between superior and subordinate persons is recognized by the history and purpose of Article 31. *See United States v. Duga*, ...; *United States v. Armstrong*, ... Because of a subordinate military person's obligation to respond to the command of his superior, Congress enacted Article 31 to serve as a protection against the inherent tendency of that relationship, either directly or subtly, to induce an accused to respond to a question by the superior.... These provisions [Article 31(b) and (d)] accord an accused even broader protection than the Fifth Amendment of the United States Constitution [*see United States v. Musguire*, 9 U.S.C.M.A. 67, 25 C.M.R. 329 (1958)], and may apply in situations far more subtle than the custodial interrogation situation defined by the Supreme Court in *Miranda v. Arizona*, ...

(Citations omitted.)

Accordingly, this Court clearly is on record that, while Article 31(a) and the Fifth Amendment coincide in scope and while Article 31(b) was enacted to serve the purpose of avoiding coerced statements in violation of both provisions, unique factors in the military environment—unknown in the civilian setting—lead us to interpret Article 31(b) as being broader in the scope of its protection than is the mandate of *Miranda*. Both the subtleties of the supe-

rior-subordinate relationship and the conditioned response, consciously created from the first day of basic training, to respond almost unthinkingly to the wishes of a military superior can permit no other result.[3]

### C

Our conclusion that Article 31(b) is broader in scope than *Miranda* does not inevitably lead to a conclusion that it should be applied differently, so that a presumption of taint as to all subsequent interrogations should follow an initial, unwarned interrogation. Much of the reasoning of the Supreme Court in *Elstad* against the carry-over effect of a *Miranda* violation might apply to Article 31(b), as well.

However, the legislative sensitivity to the subtleties of superior-subordinate relationships in the military must be taken into account in determining whether Congress would intend for a violation of Article 31(b) to create a presumptive taint with respect to later statements. Certainly, if Congress, in the exercise of its powers under the Constitution (Art. I, § 8, Cl. 14), elects to provide servicemembers this additional protection—which is not constitutionally required by the Fifth Amendment—*Elstad* does not preclude judicial implementation of that intent.

Likewise, if the President—in the exercise of his constitutionally delegated power under Article 36 of the Uniform Code, 10 U.S.C. § 836, and his authority as commander-in-chief—chooses to afford an additional safeguard for servicemembers, we must give effect to his choice, *Elstad* notwithstanding. In this connection, we note the treatment given Article 31(b) violations by the Military Rules of Evidence. The definition of an "involuntary" statement in Mil.R.Evid. 304(c)(3), Manual for Courts-Martial, United States, 1969 (Revised edition), includes statements "obtained in violation of the self-incrimination privilege or due process clause of the Fifth Amendment to the Constitution of the United States,

---

**3.** Indeed, a servicemember is educated from the beginning of his military career that failure to respond to the wishes of a superior is most often punishable under the Uniform Code of Military Justice.

Article 31, or through the use of coercion, unlawful influence, or unlawful inducement." (Emphasis added.) Moreover, in their discussion of this definition, the drafters implicitly recognized that the presumptive taint from an Article 31(b) violation carries over to subsequent interrogations when they said:

> There is no change in the principle, set forth in the fifth paragraph of paragraph 140*a* (2) of the present Manual, that a statement obtained "in an interrogation conducted in accordance with all applicable rules is not involuntary because the interrogation was preceded by one that was not so conducted, *if it clearly appears that all improper influences of the preceding interrogation had ceased to operate on the mind of the accused or suspect at the time that he or she made the statement*." In such a case, the effect of the involuntary statement is sufficiently attenuated to permit a determination that the later statement was not "*obtained* in violation of" the rights and privileges found in Rules 304(c)(3) and 305(a) ([second] emphasis added).

Drafters' Analysis of Mil.R.Evid. 304(c)(3) (erroneously designated (2)), App. 18, Manual, *supra* (first emphasis added).

Moreover, although Mil.R.Evid. 304(b) adopts *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), into military law—so that "statements taken in violation of the counsel warnings required under Rule 305(d)-(e)" are admissible "for impeachment or at a later trial for perjury, false swearing or the making of a false official statement"—"[a] statement ob-

tained in violation of Article 31(b) ... remains inadmissible for all purposes." *See* Drafters' Analysis of Mil.R.Evid. 304(b), App. 18, Manual, *supra.* Since *Harris v. New York, supra,* was one of the precedents strongly relied on by the majority in *Elstad,* the repudiation of its rationale by the Military Rules with respect to Article 31(b) violations suggests that the drafters of the Rules also intended that *Elstad* not apply to such violations.[4]

■ This interpretation of the intent of the Military Rules of Evidence leads to the conclusion that *Elstad* does not apply in this case and that the failure initially to give appellant the required Article 31(b) warnings created a presumptive taint with respect to later statements. Since it was within the power of the President to prescribe such a result, *see* Art. 36, it is unnecessary to inquire whether Congress in Article 31(b) also legislated this result.

### D

If we accept as a premise the ruling of the court below that the investigator's failure during the initial interview to warn Ravenel of his Article 31(b) rights rendered inadmissible some of his statements during that interview,[5] then the issue is whether his statements during the two later interviews also were inadmissible. Rephrased, that issue is whether, under the circumstances, any presumptive taint from unwarned statements during the initial interview was sufficiently rebutted. One factor strongly indicating that any connection between the earlier interview and the later statements was too attenuated to require

---

4. The Drafters' Analysis to this rule in Appendix 22, Manual for Courts-Martial, United States, 1984, also adopts the approach of *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), for "statements taken in violation of" required "counsel warnings" but rejects this approach with respect to any "statement obtained in violation of Article 31(b)," which "remains inadmissible for all purposes." At A22–9.

5. Judge Cox apparently rejects this premise and disagrees with the ruling of the Court of Military Review that some statements made during the initial interview were inadmissible. As he points out, "[W]e have independently determined when warnings were required and have never hesitated to use this review authority to

reverse a case. *See United States v. Lee, supra.*" 26 M.J. at 352. However, insofar as I can determine, the Court has "hesitated" to use its review authority to hold admissible a statement which the court below had ruled was *inadmissible,* so as to affirm a conviction which otherwise would have been reversed. Since the correctness of the decision below in this regard has not been certified by the Judge Advocate General for review by us, Art. 67(b)(2), UCMJ, 10 U.S.C. § 867(b)(2), that ruling now is the law of the case. *See United States v. Sales,* 22 M.J. 305, 307 (C.M.A.1986); *United States v. Jacintho,* 21 M.J. 356, 358 (C.M.A.1986); *United States v. Hogan,* 20 M.J. 71, 72 (C.M.A.1985).

exclusion is that, even before becoming a suspect, Ravenel willingly volunteered information about Covin's death. However, some circumstances point in the opposite direction.

First, Ravenel was not advised prior to either of the subsequent two interviews that his first statement could not "be used against him." While this "is not a precondition to" admissibility of the subsequently obtained statements, *United States v. Wimberley*, 16 U.S.C.M.A. 3, 9, 36 C.M.R. 159, 165 (1966), such advice, if given, would argue strongly in favor of attenuation.[6] Second, the same investigator interviewed Ravenel on all three occasions, and the subject-matter of all three interviews was the same—clearly linking all of them. Third, the "full-Nelson" hold—which had been mentioned by Ravenel during the first interview but after the time when, according to the court below, a warning should have been given—was adverted to by the investigator in conducting the second and third interviews. Finally, only minutes passed between the first tainted interview and the second. Although the interval to the third interview was 3 days, this alone would not necessarily negative the effect of the first interview on the third. *But cf. United States v. Butner*, 15 M.J. 139, 144 (C.M.A.1983) (passage of 3 days, during which accused was not in custody, was a factor separating his first, illegally obtained statement, from his second). Since the case must be remanded to the Court of Military Review for reasons unconnected with admissibility of appellant's statements, we need not decide at this time whether the requisite attenuation existed between the tainted statements in the initial interview and the admissions during the later interviews; or whether, if the later interviews were tainted, appellant was prejudiced by the information provided the factfinder by his admissions during the later interviews.

### III

Defense of another may excuse liability for assault. The 1969 Manual, *supra*, which applied when this trial occurred, authorizes self-defense if "reasonable grounds existed to apprehend that death or grievous body harm was about to be inflicted on the accused *or on a person he could lawfully defend* and the accused must in fact have had such an apprehension." (Emphasis added.) Para. 216*c*. Several opinions recognize the defense. *See, e.g., United States v. Regalado*, 13 U.S.C.M.A. 480, 33 C.M.R. 12 (1963); *United States v. Styron*, 21 C.M.R. 579 (C.G.B.R.), *pet. denied*, 7 U.S.C.M.A. 776, 21 C.M.R. 340 (1956); *United States v. Hernandez*, 19 C.M.R. 822 (A.F.B.R.1955); *United States v. Person*, 7 C.M.R. 298 (A.B.R.1953). Moreover, the Manual for Courts-Martial, United States, 1984, reaffirms that "[t]he principles of self-defense ... apply to defense of another," *see* R.C.M. 916(e)(5).

This defense was litigated at Ravenel's trial and was the specific subject of argument by both counsel prior to findings. Despite the concerted defense effort, the military judge, acting as factfinder, implicitly rejected defense of another as an excuse for the homicide. Apparently, appellate defense counsel did not raise this issue before the Court of Military Review; and it was not discussed by that court—either as a matter of law or in connection with the exercise of that court's factfinding powers.

Our specified issue indicates our concern whether the undisputed facts show that appellant was entitled to this defense as a matter of law and that, accordingly, the evidence was insufficient as a matter of law. *Cf. Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In this connection, we note especially the violence Covin directed towards his wife, his refusal to terminate his attacks on her,

---

**6.** We reiterate now what Judge Cook wrote for a majority of this Court in *United States v. Butner*, 15 M.J. 139, 144 (C.M.A.1983), quoting from Judge Fletcher's lead opinion in *United States v. Seay*, 1 M.J. 201, 204 (C.M.A.1975):

"In addition to rewarning the accused, the preferable course in seeking an additional statement would include advice that prior illegal admissions or other improperly obtained evidence which incriminated the accused cannot be used against him."

and the nature of the restraint being employed by Ravenel. Moreover, we are especially concerned that the evidence of appellant's adulterous relation with Covin's wife might have given rise to unjustified speculation as to the cause of death.

### IV

The decision of the United States Army Court of Military Review is set aside; and the record of trial is returned to the Judge Advocate General of the Army for remand to that court for further proceedings.

COX, Judge (concurring in the result):

I join the result reached by Chief Judge Everett as to the specified issue.

I respectfully disagree, however, with his opinion regarding appellant's statements because I conclude they were the product of appellant's unfettered willingness to provide them, coupled with the appropriate warnings required under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831.

Determining if a confession has been given voluntarily is a question of law. *Miller v. Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985). Similarly, in deciding whether warnings were required at a given moment, we have not regarded ourselves bound by "findings of fact" to the effect that an accused was not then a suspect. *United States v. Lee*, 25 M.J. 457, 459, 460 (C.M.A.1988), and at 465 (Cox, J., concurring in part and dissenting in part). *Cf. United States v. Sutton*, 794 F.2d 1415, 1425, 1426 (9th Cir.1986) (Court of Appeals

"review[s] [*de novo*] the totality of the circumstances to determine whether there was" sufficient basis for finding suspicion to stop defendant's vehicle). Rather, we have independently determined when warnings were required and have never hesitated to use this review authority to reverse a case. *United States v. Lee, supra*. This does not preclude us from reaching the opposite conclusion—that an accused was not a suspect at a given time such that warnings were required.

In my view the police did everything right here. They quickly and responsibly advised appellant of his rights as soon as they had a reasonable idea that he might be implicated in an offense under the Code. Under the circumstances, there is no taint to be attenuated. Thus, there is no question of the voluntariness of the subsequent statements. *See Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).*

In any event, I am of the opinion that the principles announced in *Oregon v. Elstad, supra*, apply equally to statements under Article 31, and it appears that the Court of Military Review correctly applied them.

SULLIVAN, Judge (concurring in the result):

I respectfully disagree with the entire Part II of the lead opinion. I would admit the statements at issue pursuant to the analysis of the Court of Military Review. However, I agree with Chief Judge Everett that the specified issue should be remanded and reviewed by the Court of Military Review. Accordingly, the remand is appropriate on that issue.

---

* Like the Chief Judge, I heartily agree, in the abstract, that we should "'hesitate[]' to use ... [our] review authority to hold admissible a statement which the court below had ruled was *inadmissible*, so as to affirm a conviction which otherwise would have been reversed." Lead op. at 350. Of course, in this case, the statements in issue—the post-warning statements—were ruled *admissible* by both the military judge and the Court of Military Review. My opinion is merely that I do not have to decide whether taint was attenuated because I see no taint. I make out no evidence to be admissible which was inadmissible, and I affirm no conviction that would otherwise have been reversed—by application of the law of the case, or any other, doctrine.

The law of the case, incidentally, when received by us, was the Court of Military Review's holding that failure to warn appellant of his rights after he uttered the magic words "full nelson," while error, did not preclude admission of the subsequent post-waiver statements because the taint had been attenuated. Judge Sullivan agrees with the court below, and I don't even think the issue needs to be reached. Thus, as I count, the law of the case now is that *at least* a majority of this Court regards the question of attenuation to be closed.